**EXHIBIT F**

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF INDIANA
 2                     SOUTH BEND DIVISION

 3   DePUY ORTHOPAEDICS, INC.
                              3:07CV00425
 4        vs.

 5   GAULT SOUTH BAY, INC.,        South Bend, Indiana
     ROBERT GAULT,                 September 17, 2007
 6

 7

 8                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE ROBERT L. MILLER, JR.
 9

10   APPEARANCES:

11   FOR PLAINTIFF:      DWIGHT D. LUECK
                         Barnes & Thornburg
12                       11 South Meridian Street, Suite 1313
                         Indianapolis, Indiana 46204-3535
13
     FOR DEFENDANTS:     WILLIAM N. HOWARD
14                       Freeborn & Peters
                         311 South Wacker Drive, Suite 3000
15                       Chicago, Illinois 60606

16                       ROBERT PALMER
                         May, Oberfell & Lorber
17                       4100 Edison Lakes Parkway, Suite 100
                         Mishawaka, Indiana 46545
18

19                  DEBRA J. BONK, RMR, CRR
                  Federal Official Court Reporter
20                 United States District Court
                  204 South Main Street - Room 323
21                    South Bend, Indiana 46601

22

23   Proceedings reported in machine shorthand.  Transcript
     produced by Computer-Aided Transcription - ECLIPSE
24

25
```

1                              INDEX

2    PLAINTIFF'S WITNESS:

3    BRADFORD C. LaPOINT

4    Direct Examination by Mr Lueck..............Page  8

5    Cross Examination by Mr. Howard............Page 33

6    Redirect Examination by Mr. Lueck..........Page 39

7    Recross Examination by Mr. Howard..........Page 40

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            THE COURT:  Good afternoon.

 2            This is Civil Cause 07-25, DePuy Orthopaedics versus

 3    Gault South Bay and Robert Gault, and we are gathered for

 4    hearing on the Plaintiff's motion for temporary injunction.

 5            Help me with the pronunciation, Mr. Lueck.

 6            MR. LUECK:  "Lueck," actually.

 7            THE COURT:  "Lueck," okay.

 8            MR. LUECK:  Yes, Your Honor.

 9            THE COURT:  And, Mr. Palmer, I see you are

10    accompanied, but I show you as the only attorney who has

11    appeared.

12            MR. PALMER:  Yes, Your Honor.  This is

13    William Howard from Chicago.

14            MR. HOWARD:  Good afternoon, Your Honor.

15            MR. PALMER:  His motion for pro hac is on his way

16    from his office to my office.  He has been admitted in

17    another case before this Court.

18            THE COURT:  Okay.  Did either side wish -- I have

19    read -- I would tell you I have read your submissions and

20    the evidentiary material attached to the submissions.

21            I understand that Judge Ware, on Friday, decided to

22    wait and see what happens here.

23            Did either side intend to present additional

24    evidence?

25            Mr. Lueck, anything for the Plaintiff?
```

1          MR. LUECK:  Yes, Your Honor.

2          We were expecting to introduce evidence through two

3     witnesses, one Bob Gault, the Defendant; the second, Brad

4     LaPoint, who is our client representative for DePuy.

5          The subpoena was served on Mr. Gault's counsel, who

6     declined to accept, his California counsel.  I believe it

7     has been served on him personally, but I cannot at this

8     point confirm that.

9          In any event, Mr. Gault is not here today, and I've

10    been told will not be here today.

11         I do have Mr. LaPoint.  And in light of comments

12    that counsel for Gault made regarding allegations of hearsay

13    evidence, I would like to have Mr. LaPoint take the stand

14    for about 10 to 15 minutes.

15         THE COURT:  Did the Defense intend to present

16    witnesses?

17         MR. PALMER:  Your Honor, we intend to present no

18    additional evidence.

19         However, we do have a preliminary issue of personal

20    jurisdiction over Mr. Gault, and Mr. Howard would like to

21    argue.

22         MR. HOWARD:  Thank you, Your Honor.

23         And just by way of housekeeping, there was a

24    pleading filed on behalf of my clients, and it was the

25    motion to dismiss or in the alternative to stay.

1          THE COURT:  I have read that.

2          MR. HOWARD:  Very well.

3          With respect to the issue of the subpoena on

4     Mr. Gault, there's a couple of issues.  The first is --

5          THE COURT:  I understand it they're not trying to

6     enforce it, so I'm not --

7          MR. HOWARD:  Well, I understand.  But it was also

8     issued out of the California court, and there's a question

9     as to whether, even if Mr. Gault was served -- and my

10    information this morning, he has not been served -- there

11    would be some question as to the priority or validity of

12    that subpoena.

13         THE COURT:  What will you be asking me to decide

14    here because I gather they're not asking me to enforce it?

15         MR. HOWARD:  I understand, but I mention it because

16    there's an issue with respect to jurisdiction over Mr. Gault

17    himself personally.

18         Mr. Gault is a resident of California, a citizen of

19    California.  His business is conducted in California.

20         In Paragraph 4 of the Plaintiff's complaint, they

21    state that as a general statement without any supporting

22    information or evidence, that the Court has jurisdiction

23    over all the parties.

24         They then refer to Paragraph 6, the venue provision,

25    and cite 1391.

 1          There's a basic flaw with jurisdiction with respect

 2    to Mr. Gault.  He has no connection with Indiana.  He's not

 3    a party to the agreement.  He's never submitted to

 4    jurisdiction in Indiana.  He's got nothing to do with

 5    Indiana whatsoever.  There's no personal jurisdiction over

 6    him.

 7          So, therefore, any relief that Plaintiffs are

 8    requesting with respect to Mr. Gault we think is misplaced

 9    given the fact that there is no personal jurisdiction, not

10    even to mention the venue issues.

11          So we believe that this is - proceeding at this

12    point with respect to Mr. Gault would be improper because we

13    have not acquiesced to jurisdiction.  He's got nothing to do

14    with Indiana whatsoever.

15          And I don't know how counsel intends to address that

16    or if they can even redress it, but I think that's a

17    preliminary issue that we need to get right up front.

18          As the court is probably aware on the contract in

19    issue, there was a place for Mr. Gault to sign individually.

20    He did not do so.

21          THE COURT:  Let me propose -- since I think that

22    weaves in with several of your other arguments, as I

23    understand it, why don't we allow the evidence to proceed

24    and then let both sides argue that at the close of the

25    evidence today, because, obviously, that weaves together

1    how -- I think the same facts that you're talking about tie

2    together on both jurisdiction and the likelihood of success

3    on the merits, don't they?

4         MR. HOWARD:  Yes and no, Your Honor.

5         The reason I raise it now is because it is a

6    threshold issue as to whether there's jurisdiction over

7    Mr. Gault, and there is no basis of any kind to assert any

8    claim against him.

9         With respect to the success in the merits, clearly

10   that is one of the categories here.  But, again, we just

11   wanted to raise this up front because p.j. -- I'm sorry --

12   personal jurisdiction is a preliminary issue, and I wanted

13   to make sure that that was clear, no indication that there

14   was any connection with Indiana whatsoever here.

15        THE COURT:  Okay.  I'll show the motion being made

16   at the outset of the hearing with further argument deferred

17   until the conclusion of the hearing.

18        MR. HOWARD:  Thank you, sir.

19        THE COURT:  I think we can address it all altogether

20   a little bit better.

21        You may proceed.

22        MR. LUECK:  Thank you, Your Honor.

23        I call to the stand Brad LaPoint.

24

25

Page 8

```
1                       BRADFORD CLARK LaPOINT,

2           called as a witness by the Plaintiff, having been first

3           duly sworn, was examined and testified as follows:

4                          DIRECT EXAMINATION

5           BY MR. LUECK:

6      Q    Good afternoon, sir.

7      A    (No response.)

8      Q    Would you, please, state your full name for the record.

9      A    Bradford Clark LaPoint.

10     Q    What is your address?

11     A    My address is 11 San Pablo Street; Novato, California;

12     94949.

13     Q    Are you employed?

14     A    I am.

15     Q    By whom?

16     A    Johnson & Johnson, DePuy Orthopaedics.

17     Q    Do you have any understanding as to where DePuy

18     Orthopaedics is located?

19     A    I do.  Warsaw, Indiana.

20     Q    How long have you worked for DePuy?

21     A    Six years.  Excuse me.  Seven years.

22     Q    What is your position today at DePuy?

23     A    Territory general manager for Northern California.

24     Q    What are the duties of that job?

25     A    Overseeing the sales and distribution for DePuy
```

1    Orthopaedics.

2    Q    You mentioned territory manager for Northern

3    California.  Approximately how far south in the state does

4    your territory extend?

5    A    Just past Monterey to the south and up just to Eureka

6    to the north.

7    Q    Whom do you work with?

8    A    Physicians, hospitals, and sales representatives.

9    Q    Do you communicate on a regular basis directly with the

10   physicians and hospitals?

11   A    I do.

12   Q    Are there any people in the DePuy organization below

13   you that would interface with the hospitals and surgeons?

14   A    There are.

15   Q    Who are they?

16   A    Sales representatives.

17   Q    Are you in charge of supervising sales representatives?

18   A    I am.

19   Q    How many sales representatives are you in charge of

20   supervising?

21   A    Thirty-seven.

22   Q    Are all of these sales representatives individuals?

23   A    No.  Some are organizations or groups.

24   Q    Do those organizations then have additional people who

25   represent the DePuy product?

1  A    Yes, they do.

2  Q    What does DePuy offer?

3  A    Orthopaedics products and instrumentation and training.

4  Q    Can you give some examples of the products that it

5  offers?

6  A    Primarily total hip and knee replacement, shoulder

7  replacement, most implantable orthopaedic products.

8  Q    You mentioned that you supervise sales representatives.

9  Are those sales representatives important to DePuy?

10  A    Yes, they are.

11  Q    How?

12  A    They are the face and the -- they're involved in the

13  surgical aspect, selling the product, making sure that the

14  hospital has the appropriate implants, providing that

15  service to the physicians.

16  Q    Does DePuy provide the sales representatives with any

17  materials or assistance?

18  A    Yes, literature, X-ray templates, sample products.

19  Q    You mentioned that you have a territory of Northern

20  California.

21       Are all of the hospitals in that territory assigned

22  to one DePuy sales rep or another?

23  A    Yes.  There are five different teams that we have.

24  Q    Can you define those different teams?

25  A    Yes.

Page 11

1            Previously, we had Gault South Bay Orthopaedics.

2            We have B & R Orthopaedics; Eulis Haselden,

3    Incorporated; Mark Morey, Incorporated; and Mike Olmes,

4    Incorporated.

5    Q    You mentioned Gault.  Was Gault or Gault South Bay a

6    distributor or -- I'm sorry -- a sales representative for

7    some amount of time?

8    A    Yes, he was.

9    Q    Do you know when they became a sales representative?

10   A    I believe he started working for DePuy in 1997 or '98.

11   Q    Do you have any understanding of whether Mr. Gault had

12   been involved in the orthopaedics industry prior to joining

13   with DePuy?

14   A    Yes.  He was an independent representative with

15   Howmedica Orthopaedics.

16   Q    Is Howmedica a competitor of DePuy?

17   A    They are.

18   Q    Can you identify any other competitors of DePuy active

19   in Northern California?

20   A    Zimmer; Stryker; Smith, Nephew, Richards; and Biomet.

21            MR. LUECK:  May I approach the witness, Your Honor?

22            THE COURT:  You may.

23            BY MR. LUECK:

24   Q    Mr. LaPoint, I handed you what's been marked Exhibit A.

25   Can you identify that document?

Page 12

1  A    This is a standard independent contractor agreement.

2  Q    Between whom is this agreement?

3  A    Between the independent contractor and DePuy

4  Orthopaedics.  In this case, my office.

5  Q    This contract is dated November 22nd, 2006.  Do you see

6  that on the first page?

7  A    I do.

8  Q    Is that approximately the date that you understand the

9  contract to have been executed?

10  A    Yes.

11        MR. LUECK:  Move for the admission of Exhibit A.

12        THE COURT:  Any objection?

13        MR. HOWARD:  Subject to Cross Examination, if the

14  Court, please.

15        THE COURT:  Sure.  You'll be able to cross-examine

16  on all that come in.

17        Any objection to the admissibility at this point?

18        MR. HOWARD:  Not at this time.

19        THE COURT:  If something develops on Cross, you can

20  move to strike.

21        Exhibit A is admitted without objection.

22      BY MR. LUECK:

23  Q    Mr. LaPoint, I direct your attention on Exhibit A to

24  Page 10.  It's numbered Page 10.  I think it's probably the

25  eleventh page of the exhibit itself.

```
1    A    Okay.

2    Q    Do you see that page?  It has some signatures on it.

3    A    Yes.

4    Q    The first signature is identified as that of Bradford

5    C. LaPoint.  Is that your signature?

6    A    It is.

7    Q    And the agreed and accepted appears to be that of

8    Mr. Gault.  Do you see that?

9    A    Yes.

10   Q    Looking to the right, there's an approved signature.

11   Who signed that?

12   A    That's Bruce Cavarno, our area director for the West.

13   Q    Looking below those signature blocks, there's a

14   paragraph that starts out:  As a material inducement to

15   DePuy to enter into the foregoing agreement.  It goes on.

16   Do you see that paragraph and that signature block?

17   A    I do.

18   Q    Did you ask Mr. Gault to sign that signature block?

19   A    I did not.

20   Q    Why not?

21   A    That's intended for the subreps that work underneath

22   the main principals.  In this case, Bob Gault.

23   Q    Did you allow Mr. Gault an opportunity to review this

24   agreement in advance of asking that he sign it?

25   A    I did.
```

```
1    Q    Did you ask him to sign it?

2    A    Yes, I did.

3    Q    Did he sign it?

4    A    He did.

5    Q    I would ask you to direct your attention to the page

6    that follows the signature page, Appendix A.  Do you see

7    that page?

8    A    Yes.

9    Q    And it identifies a territory as all accounts listed

10   for Customer Number 701940.  Do you see that?

11   A    Yes.

12   Q    What do you understand Customer Number 701940 to be?

13   A    That is Bob Gault's account number with the company.

14        Each rep -- each rep group has an assigned number

15   for ordering templates and sample products and so forth, and

16   that's what that number represents, his actual number.

17   Q    What accounts do you understand to be listed for that

18   customer number?

19   A    The accounts in the South Bay territory that Bob Gault

20   represented.

21        MR. LUECK:  Your Honor, may I approach the witness?

22        THE COURT:  You may.

23        BY MR. LUECK:

24   Q    Mr. LaPoint, I've handed you what's been marked as

25   Exhibit B.
```

1   A    Uh-huh.

2   Q    Can you identify that exhibit?

3   A    Yes.

4   Q    What is that exhibit?

5   A    These are Bob Gault's hospital accounts that he had

6   account responsibility for.

7   Q    Is this a list of those accounts as they existed at the

8   time that Mr. Gault ceased to represent DePuy products?

9   A    Yes.

10  Q    Was this the list of accounts that existed as of the

11  date that Mr. Gault signed the agreement, Exhibit A?

12  A    Yes.

13  Q    Can you define, in general terms, the location or

14  geography where these accounts are located?

15  A    It's the Silicon Valley, Stanford, San Jose, Los Gatos

16  area of Northern California.

17  Q    Are there other accounts in that general territory or

18  that general geography that are not listed on this list,

19  Exhibit B?

20  A    Yes.

21  Q    And what do you understand those other accounts that

22  were not assigned to Bob Gault to be?

23  A    In the proximity to these, that would be Santa Cruz,

24  Santa Clara, South San Francisco, Fremont, and Hayward.

25  Q    Do you know whether Mr. Gault, Gault South Bay,

1    represented these accounts prior to the execution of the

2    agreement, Exhibit A?

3    A    Yes, he did.

4    Q    Did Mr. Gault voice any objections to signing Exhibit

5    A?

6    A    He did not.

7    Q    Did he indicate to you whether he had sought legal

8    counsel before signing the exhibit?

9    A    He did not.

10            MR. HOWARD:  Objection, Your Honor.  I would move to

11   strike.  There's no evidence that Mr. Gault has signed

12   Exhibit A in his individual capacity.

13            THE COURT:  I don't think the question called for

14   specificity.

15            I understand the Defendants' position on that.

16            MR. HOWARD:  Thank you, Your Honor.

17            THE COURT:  I think the question is whether he

18   voiced any objection before signing it.  And as I understand

19   it, there's no issue as to whether he signed it, just the

20   capacity.

21            MR. HOWARD:  Yes, sir.  Thank you.

22            THE COURT:  So the objection is overruled.

23            MR. LUECK:  May I approach the witness, Your Honor?

24            THE COURT:  You may.

25        BY MR. LUECK:

1    Q    Mr. LaPoint, I've handed you what's been marked Exhibit

2    C.  Can you identify that document?

3    A    Yes.

4    Q    What is it?

5         THE COURT:  I think the question is what it is, sir.

6         THE WITNESS:  Oh, I'm sorry.

7    A    This is an addendum to his previous agreement, and the

8    addendum stated, in Areas 1 and 2, our modifications to the

9    previous contract that he had.

10        BY MR. LUECK:

11   Q    Is the previous contract that you're referring to

12   Exhibit A?

13   A    Correct.

14   Q    So this is an addendum to Exhibit A?

15   A    Correct.

16   Q    Are you aware of any other addendums, addenda, or

17   amendments to Exhibit A aside from this Exhibit C?

18   A    Not during this contract period.

19        MR. LUECK:  Move to admit Exhibit C.

20        THE COURT:  Any objection to Exhibit C?

21        MR. HOWARD:  Not at this time, Your Honor.

22        THE COURT:  Without objection, Exhibit C is admitted

23   into evidence.

24

25

Page 18

1        BY MR. LUECK:

2    Q     Mr. LaPoint, is that your signature on Exhibit C?

3    A     Yes, it is.

4    Q     And do you see directly below you is a signature.    Can

5    you identify that signature?

6    A     That's Robert Gault's.

7    Q     And below that is, it looks like, a printed name.    Can

8    you read that printed name?

9    A     Robert G. Gault.

10   Q     Do you see any reference beside that printed name,

11   Robert G Gault, to president or sole shareholder or any

12   other limitation?

13   A     I do not.

14   Q     Did Mr. Gault raise with you an issue of whether he

15   should be signing this as Robert Gault or as Robert Gault,

16   president of Gault South Bay?

17   A     He did not.

18   Q     Was it an issue?

19   A     No, it was not.

20   Q     Approximately how many years did Mr. Gault represent

21   DePuy products?

22   A     Ten, 10 to 11.

23   Q     Are you aware of whether in that time he visited

24   Indiana at any time?

25   A     Yes, I believe he did.

1    MR. HOWARD:  Objection.  Lack of foundation, Your

2  Honor.

3    THE COURT:  Well, I'll allow the question as to

4  whether he's aware and then follow up to show a foundation,

5  so I'll allow the question.

6    BY MR. LUECK:

7  Q    You said that you believe you are.  What basis do you

8  have for having any understanding of what Mr. Gault did

9  during his time at DePuy?

10  A    I believe he went with surgeon customers back to do

11  what we call a plant tour.  He went and saw the facility,

12  showed the physicians how we make products.

13  Q    And where is the plant located?

14  A    Warsaw, Indiana.

15  Q    Do you know how many times Mr. Gault came to Warsaw,

16  Indiana on a plant tour?

17  A    I do not.

18  Q    Are you aware of any other visits that Mr. Gault made

19  to Indiana?

20  A    I am aware of a trip to visit Biomet.

21  Q    Who's Biomet?

22  A    Biomet's a competitor to DePuy Orthopaedics.

23  Q    What basis do you have for believing that Mr. Gault

24  made a trip to Biomet?

25  A    I was told by --

1          MR. HOWARD:  Objection, Your Honor.  It calls for

2    hearsay unless it's Mr. Gault himself.

3          THE COURT:  I think the hearsay part's already out.

4    Let me hear where he got it, and then I'll entertain a

5    motion to strike.

6          You were told by whom?

7          THE WITNESS:  Told by physician customers and other

8    sales representatives.

9          THE COURT:  Do you move to strike?

10          MR. HOWARD:  I'd move to strike, Your Honor.

11          THE COURT:  Your response?

12          MR. LUECK:  Your Honor, this is a temporary

13    restraining order hearing.  It is appropriate at this point

14    to relax the rules on evidence, taking into account, of

15    course, that because those rules are relaxed, some evidence

16    may have more weight than others, but I believe it is

17    appropriate for Mr. LaPoint to identify his understanding

18    and for the Court to consider it for what it's worth.

19          THE COURT:  I think we're probably now at the

20    intersection of the -- what I had indicated before.  I

21    thought there would be a substantial overlap between the

22    facts, as far as Mr. Gault's relationship to the agreement,

23    and the jurisdiction argument that was raised before.

24          I understand your argument goes to that first point.

25    How do you respond to the extent this evidence would be

1   considered on the personal jurisdiction issue?

2           MR. LUECK:  Well, Your Honor, I believe that, to the

3   extent that the evidence is admissible, it would be directly

4   attributable and usable in the jurisdictional issue, so

5   certainly the testimony that just took place regarding

6   visits to Warsaw would be relevant as to the DePuy visits.

7           This issue, at this point, may not be admissible on

8   the jurisdiction point but would be admissible, I believe,

9   on the issue of whether a temporary restraining order is in

10  place.

11          THE COURT:  So you're offering it only on the TRO

12  then rather than on the --

13          MR. LUECK:  As to the visit to Biomet, yes.

14          THE COURT:  The objection is overruled,

15  understanding it's admitted for the limited purpose of

16  dealing with the TRO rather than personal jurisdiction

17  issue.

18          Again, I think it would go to the weight,

19  understanding that in TROs we all have to move a little

20  faster than we can normally marshal evidence.

21          MR. LUECK:  Thank you, Your Honor.

22  Q    Mr. LaPoint, what is the basis for your understanding

23  that Mr. Gault visited Indiana in connection with Biomet?

24  A    My understanding was to go back and strike a

25  relationship in a contractual sense.

1   Q      What is that understanding based on?

2   A      The fact that he is now working for Biomet.

3   Q      Have you spoken with anyone regarding the basis for

4   that understanding?

5          MR. HOWARD:  Objection, Your Honor.  Again, asking

6   for a hearsay response.  Before the cow is out of the barn,

7   I would like to address that.

8          THE COURT:  All of these questions with respect to

9   the Biomet trip, were all of those offered for the limited

10  purpose then of the TRO?

11         MR. LUECK:  Yes, Your Honor.

12         THE COURT:  I'll view the evidence as far as the

13  Biomet trip solely for that purpose.

14         MR. HOWARD:  Your Honor, just one other point

15  building on counsel's comment about the relaxing of rules.

16         I know the Court is likely aware of this, but

17  Mr. DePuy fired Mr. Gault on August 20th, and it's now

18  almost a month later.  So this is not a traditional

19  situation of two days after something happens, the parties

20  are out trying to introduce evidence.  They've had a month

21  to try to get their ducks in a row.  In fact, you know, they

22  filed -- the original action was filed in California

23  August 24th, so I would ask --

24         THE COURT:  Okay.  I've got a question on that.  I'm

25  going to wait until the argument.  I think that will go to

Page 23

1    the weight rather than the admissibility.

2            MR. HOWARD:  Thank you, sir.

3            THE COURT:  The objection -- again, it's admitted

4    only on the TRO, not on the personal jurisdiction.

5            BY MR. LUECK:

6    Q    What is your understanding that Mr. Gault visited

7    Biomet based upon?

8    A    Feedback from physician customers and sales

9    representatives.

10   Q    Mr. Howard raised the point that Bob Gault, Gault South

11   Bay, were terminated by DePuy.  Is that a true statement?

12   A    Yes.

13   Q    Why was Bob Gault terminated by DePuy?

14   A    A number of physician customers and sales

15   representatives brought information forward to me that he

16   was soliciting them to go to Biomet.

17   Q    And is that information the basis for the termination

18   of Mr. Gault?

19   A    Yes.

20   Q    What is that information that was brought to you?

21   A    That he -- his intention was to go --

22           MR. HOWARD:  Objection, Your Honor.  Lack of

23   foundation and, again, hearsay.

24           THE COURT:  Same ruling.  The objection is

25   overruled.

Page 24

1   A    His intention was to go to Biomet and wanted to have

2   them go with him, the sales representatives and the

3   physician customers.

4        BY MR. LUECK:

5   Q    Who told you this?

6   A    Several physician customers and sales representatives.

7        MR. HOWARD:  Your Honor, if the Court please, can I

8   just have, rather than interrupt, a standing objection to

9   any hearsay with respect --

10       THE COURT:  As far as what he was told about what

11  Mr. Gault was doing?

12       MR. HOWARD:  Yes, sir.

13       THE COURT:  A continuing objection is permitted,

14  what he was doing in relation to Biomet.  I guess we may get

15  into another area, but the continuing objection is allowed.

16       MR. HOWARD:  Thank you.

17       MR. LUECK:  Your Honor, I would also just note for

18  the record that in response to Mr. Howard's hearsay

19  objection, part of the relevance for this evidence goes to

20  what the basis was for Mr. LaPoint acting as he did, so it

21  would not be hearsay in that respect.

22       THE COURT:  I understand.  We're running with about

23  three different levels here, and I'm grateful we don't have

24  a jury.

25

1      BY MR. LUECK:

2  Q    Mr. LaPoint, on a physician-by-physician basis -- and

3  if you wish not to use names, perhaps you can use the

4  facility at which the physician typically operates -- could

5  you provide me with information relating to what was told to

6  you by those physicians?

7          MR. HOWARD:  Excuse me, Your Honor.  Again, I hate

8  to keep interrupting.

9          But if he is going to relate a conversation, I

10  think, in fairness so that we know exactly what we're

11  speaking of, we should identify who the individual is that

12  supposedly made the comment versus an institution where

13  there may be 50 or 100 doctors, and I would ask that the

14  witness be directed to do so.

15          THE COURT:  As I understand it -- oh, yeah, I guess

16  we have gotten into that.

17          Do you wish to respond, Mr. Lueck?

18          MR. LUECK:  I don't believe we have any objection to

19  naming the names.

20          THE COURT:  Okay.  If you would, restate your

21  question then, please.

22          BY MR. LUECK:

23  Q    Mr. LaPoint, could you, please, proceed?

24  A    Dr. Steve Woolson from Stanford University called me

25  and told me that Bob wanted to take him back to Biomet and

Page 26

1    develop a consulting relationship, design implants.

2              Dr. John Lannin had told me -- also from Stanford.

3    Excuse me -- that he was also told by Bob that he was going

4    to go to Biomet.

5              Dr. Ed Littlejohn in Los Gatos, California told me

6    that Bob had approached him on the same premise.

7              As well as Dr. Terrence Delaney, also from Los

8    Gatos.

9              Those were the physician customers.

10             The representatives are his entire sales group:

11   Craig Frey, Candice Polich; John Angileri; and Jake Daneman;

12   as well as Mike Olmes who's a senior rep to his adjacent

13   territory; as well as Eulis Haselden, a sales rep to his

14   adjacent territory.

15   Q    Were these individuals that you just mentioned all of

16   the people that are sales function within the Gault South

17   Bay organization?

18   A    Just the ones that worked for him, not Mike Olmes and

19   Eulis Haselden.

20   Q    What did these individuals tell you?

21   A    They told me that Bob was intending on going to Biomet

22   and converting the DePuy business to Biomet.

23   Q    Did you ultimately decide to terminate Mr. Gault?

24   A    Yes.

25   Q    When did you make that decision?

1    A    I believe around the 20th of August.

2    Q    Did Mr. Gault object to his termination?

3    A    I did not see him in person when he received the

4    document.  I'm not aware if he -- I believe he did.

5    Q    He did object?

6    A    No, I believe he did not object.

7    Q    What do you understand the term of the agreement to

8    have been if Mr. Gault had not been terminated for cause?

9    A    I'm sorry.  Repeat the question.

10   Q    Do you have any understanding of what the term of that

11   agreement, Exhibit A, would have been if Mr. Gault had not

12   been terminated for cause?

13   A    Well --

14        THE COURT:  You're asking how long the agreement

15   lasted?

16        BY MR. LUECK:

17   Q    How long would the agreement have lasted?

18   A    The agreement would have lasted through the end of the

19   year, the calendar year.

20   Q    Have you paid Gault South Bay and Mr. Gault all of the

21   commissions that are due and owing to them?

22   A    Yes.

23   Q    Have you complied with all of your obligations to Gault

24   South Bay and Gault as DePuy to your understanding?

25   A    Yes.

Page 28

1   Q    Do you have any understanding of the action that

2   Mr. Gault took or the reaction that Mr. Gault took to being

3   terminated?

4   A    I'm not.

5   Q    Are you aware of whether Mr. Gault at any point brought

6   a lawsuit against DePuy?

7   A    I believe he did on the same day of his termination

8   letter.

9   Q    How did you become aware of that lawsuit?

10   A    Through my office.

11   Q    Who at your office?

12   A    Deanna Madge.

13        MR. HOWARD:  Objection, Your Honor.  Again, we'd

14   move to strike as hearsay.

15        THE COURT:  I don't think that would be.  I'll allow

16   it.

17        BY MR. LUECK:

18   Q    Do you have any understanding of whether Mr. Gault was

19   the only identified plaintiff in that lawsuit?

20   A    I believe his representative, Candice Polich, was also

21   listed on that.

22   Q    Who do you understand Ms. Polich to be?

23   A    She is a subrepresentative working for Bob Gault.

24   Q    Is she still working for Bob Gault today?

25   A    She is not.

1   Q     For whom is she working today?

2   A     She is contracted directly with DePuy.

3   Q     Do you know when she contracted with DePuy?

4   A     I believe about two weeks ago.

5   Q     What do you understand Mr. Gault to be doing today?

6   A     My understanding is he is working for Biomet.

7   Q     What's that understanding based on?

8   A     Him covering surgeries in hospitals that he previously

9   represented DePuy Orthopaedics.

10  Q     When did you receive information that he was covering

11  surgeries at hospitals formerly assigned to him by DePuy?

12  A     Last week.

13        MR. HOWARD:  Objection, if the Court please.  Lack

14  of foundation and hearsay.

15        THE COURT:  The objection is overruled on the

16  grounds previously stated.

17  A     Last week.

18        BY MR. LUECK:

19  Q     Understanding Mr. Howard's objection, but I will ask

20  the question, and understand it may be subject to the

21  objection.

22        Do you have any other information as to recent

23  activities of Mr. Gault?

24  A     He had a Biomet-sponsored physician meeting last week.

25        MR. HOWARD:  Objection, Your Honor.  Again, same

1    objection.

2            THE COURT:  The objection is noted and overruled

3    pursuant to the earlier record.

4        BY MR. LUECK:

5    Q    What's the basis for that understanding as to --

6            THE COURT:  I'll allow you a continuing objection on

7    this line of questioning.

8            MR. HOWARD:  Thank you, sir.

9        BY MR. LUECK:

10   Q    What's the understanding for that -- what's the basis

11   for that understanding, Mr. LaPoint?

12   A    Feedback from physician customers that they actually

13   attended the dinner meeting.

14   Q    Mr. LaPoint, do you believe that DePuy has been harmed

15   by Mr. Gault's actions since he left DePuy?

16   A    I do.

17   Q    How has it been harmed?

18   A    From the standpoint of representatives seeking

19   additional monies, us having to rewrite those contracts, and

20   the reputation of our company.

21   Q    What do you mean by "reputation of our company"?

22   A    Defaming comments made by Bob Gault.

23   Q    What do you understand these comments to be or what do

24   you contend these comments to be?

25           MR. HOWARD:  Again, objection, Your Honor.  Lack of

Page 31

```
 1    foundation and hearsay for yet another area of evidence.
 2              THE COURT:  Same ruling as noted, and I'll allow a
 3    continuing objection as to this line of questions as well.
 4    A    Specific product, identifying product as having failing
 5    issues, problems with clinical performance, unfound, as well
 6    as a general position that Mr. Gault has regarding the
 7    viability of DePuy as an organization and his discussion
 8    about that with physician customers.
 9              BY MR. LUECK:
10    Q    Mr. LaPoint, who were you retained or employed by
11    before you came to DePuy?
12    A    Biomet Orthopaedics.
13    Q    How long were you with Biomet?
14    A    Seven years.
15    Q    What position did you hold with them?
16    A    I was an independent distributor in Southern
17    California.
18    Q    Did you have a contract?
19    A    I did.
20    Q    Did that contract include a covenant not to compete?
21    A    Yes, it did.
22    Q    What was the term of that covenant not to compete?
23    A    Thirty days.
24    Q    Did you leave at any point from Biomet?
25    A    I did.
```

Page 32

1    Q    Did Biomet demand that you abide by your covenant?

2    A    Yes, they did.

3    Q    Did you abide by your covenant?

4    A    Yes, I did.

5    Q    Have you ever been engaged in any litigation with

6    Biomet?

7    A    Yes, I have.

8    Q    What was that?

9    A    I filed a lawsuit for commissions owed at the time of

10   my termination.  I filed that in the State of California.

11   Biomet filed a claim against me in the State of Indiana.

12   Q    Was that a separate lawsuit or something that was

13   transferred from California?

14   A    Transferred from California.

15   Q    What was the result of that lawsuit?

16   A    I settled in court, settled with them, and I paid out

17   what the judge had mediated.

18   Q    And was that a result of a lawsuit that started in

19   California or a result of a lawsuit that started in Indiana?

20   A    A result from the lawsuit that transferred from

21   California to Indiana.

22        MR. LUECK:  Okay.  I have no further questions.

23        THE COURT:  Thank you, sir.

24        Before I turn it over for Cross, let me just

25   clarify.

1          As I understand what you're saying, sir -- and I

2     don't want to put words in your mouth -- there was one

3     lawsuit; you filed it in California; it got transferred to

4     Indiana; and Biomet filed a counterclaim here; and that's

5     where it settled?

6               THE WITNESS:  That's correct.

7               THE COURT:  Okay.  Thank you, sir.

8               You may cross-examine.

9               MR. HOWARD:  Thank you, Your Honor.

10                         CROSS EXAMINATION

11        BY MR. HOWARD:

12    Q    Mr. LaPoint, the noncompete agreement that you had with

13    Biomet --

14    A    Yes.

15    Q    -- that had a form or venue selection clause in it,

16    didn't it?

17    A    A venue selection?  I'm not --

18    Q    In other words, that agreement stated that you must

19    file the lawsuit in Indiana, right?

20    A    I don't believe so.

21    Q    You don't believe so or do you know for sure one way or

22    the other?

23    A    I do not know for sure.

24    Q    Well, isn't it true that Biomet filed suit in Indiana

25    because there was a venue clause that said Indiana?

1    A    That could be.  I'm not --

2    Q    And you filed suit in California, right?

3    A    Yes.

4    Q    And you filed suit in California even though there

5    was -- there was a paragraph in the agreement that said that

6    you're supposed to file in Indiana, right?

7    A    I can't recollect.

8    Q    Now, you were actually fired from Biomet, right?

9    A    Yes.

10   Q    And as a result of the court proceedings, you were

11   required to pay Biomet money, correct?

12   A    Yes.

13   Q    You claimed that Mr. Gault had made some defamatory

14   comments about DePuy.  Do you remember that testimony?

15   A    Yes.

16   Q    When did you become aware of those alleged defamatory

17   comments?

18   A    The week -- I believe it was the -- August 18th or

19   19th, somewhere in that time frame.

20   Q    DePuy's filed a five-count complaint in this Court.

21   There's not a complaint or a count in that complaint about

22   defamation, is there?

23   A    I don't believe there is.

24   Q    You mentioned several doctors that supposedly told you

25   some information about Mr. Gault's conduct.  Do you remember

1   Drs. Woolson, Lannin, Delaney, and a few others, right?

2   A    Yes.

3   Q    Okay.  All of those doctors are in California, right?

4   A    That's correct.

5   Q    You also mentioned four or five individuals that you

6   say told you some things that Mr. Gault said to them,

7   correct?

8   A    Correct.

9   Q    And all of those individuals are in California, right?

10  A    Correct.

11  Q    You personally don't have an office in Warsaw, do you?

12  A    I do not.

13  Q    Isn't it true, Mr. LaPoint, that when DePuy would make

14  payments to Gault South Bay, Inc., those drafts or checks

15  were written out to Gault South Bay, Inc.?

16  A    Yes.

17       Can I add to that?

18  Q    No, you may not.  If your counsel would like to, sir,

19  you can go ahead later on.

20       You were also asked a question about whether you

21  asked Mr. Gault to sign the bottom of the last page of

22  Exhibit A.  Do you remember that question?

23  A    I do.

24  Q    And you actually at first said, "No," you did not, and

25  then you subsequently testified that, "Yes," you did.  Which

Page 36

1   is correct?

2           Did you ask Mr. Gault to sign at the bottom of the

3   page or did you not ask him to sign at the bottom of that

4   page?

5           MR. LUECK:  Objection.  Mischaracterizes the

6   evidence.

7           THE COURT:  Hold to the question.  I'm going to

8   strike the preface to the question, because my memory is a

9   little different, but I'll allow the question itself.

10  A    Mr. Gault did sign the document.

11          BY MR. HOWARD:

12  Q    Mr. LaPoint, I was directing you to the bottom of the

13  last page of Exhibit A where you were asked the question as

14  to whether --

15          MR. HOWARD:  May I approach, Your Honor?

16          THE COURT:  Sure.

17          BY MR. HOWARD:

18  Q    -- as to whether he signed or not.

19          And my recollection -- and I may be wrong, but the

20  record will speak for itself -- is that first you said you

21  did not ask him.  Then you said you did ask him.

22          Your testimony now is that you did ask Mr. Gault to

23  sign at the bottom of the page?

24  A    I did not.

25  Q    You did not.

1        I'd like you to take a look at the very first page

2    of Exhibit A, sir.

3    A     Okay.

4    Q     That is the document that's dated November 22nd, 2006

5    on the top left?

6    A     Yes.

7    Q     The name that appears in the top left of that document

8    is Gault South Bay, Inc., correct?

9    A     Correct.

10   Q     And on the top right is the name DePuy Orthopaedics,

11   Inc., correct?

12   A     Correct.

13   Q     The address that appears on the bottom of Page 1, that

14   is a California address, correct?

15   A     Correct.

16   Q     I'd like you to take a look at the very first paragraph

17   of the very first page.  There's a reference to the word

18   "contractor."  Do you see that?

19   A     I do.

20   Q     And the words that immediately precede the word

21   "contractor" are "Gault South Bay, Inc.," correct?

22   A     Correct.

23   Q     This document, Exhibit A, was drafted by DePuy,

24   correct?

25   A     Yes.

Page 38

1   Q    Any of the customers -- strike that.

2        The customers that are listed on Exhibit B --

3   A    Yes.

4   Q    -- all of the entities listed on Exhibit B are located

5   in California, correct?

6   A    Correct.

7   Q    And the other entities that you referred to that are

8   not listed on Exhibit B are also in California, correct?

9   A    Correct.

10  Q    And you personally reside in California?

11  A    Correct.

12  Q    And your offices are indicated in California, correct?

13  A    Correct.

14  Q    You prepared an affidavit in this case, correct?

15  A    Yes, I did.

16  Q    And at the time that you prepared the affidavit, you

17  made sure that, before you signed it, it was accurate?

18  A    Yes.

19  Q    Did you type that affidavit up yourself?

20  A    I did not.

21       MR. HOWARD:  May I have one second, Your Honor?

22       THE COURT:  Uh-huh.

23                        (Discussion held off record.)

24       BY MR. HOWARD:

25  Q    Mr. LaPoint, you testified, in response to Mr. Lueck's

Page 39

1    question about the length of your noncompete with Biomet.

2    It really wasn't 30 days; it was actually six months, wasn't

3    it?

4    A    I don't recollect.

5    Q    And that that noncompete only applied to you if you

6    quit Biomet, correct?

7    A    Again, I don't recollect.

8    Q    The addenda to the underlying agreement, Exhibit A --

9    and I believe it's identified as Exhibit C -- that document

10   was also prepared by DePuy?

11   A    Yes.

12   Q    Okay.  And in that document, there is a reference at

13   the top, again, to Gault South Bay?

14   A    Correct.

15   Q    And in Paragraphs 1 and 2, there is, again, a reference

16   to Gault South Bay, Inc. in Paragraph 1 and Gault South Bay,

17   Inc. in Paragraph 2, correct?

18   A    Correct.

19         MR. HOWARD:  Thank you.

20         THE COURT:  Thank you, sir.

21         Any Redirect, Mr. Lueck?

22         MR. LUECK:  Just one, Your Honor.

23                   REDIRECT EXAMINATION

24      BY MR. LUECK:

25   Q    Mr. LaPoint, on questioning from Mr. Howard, he asked,

1    I believe, the checks that were paid to this group, Gault or

2    Gault South Bay, to whom the checks were drawn, to whom the

3    checks were written to?

4    A    Yes.

5    Q    To whom were the checks written?

6    A    Bob Gault.

7    Q    Did you say previously Gault South Bay?

8    A    I would have to look into that.  I'm -- I am not sure

9    if it's Gault South Bay the checks were directly written to

10   or directly to Bob Gault.

11   Q    What would you need to do to confirm that?

12   A    Contact my office.

13        MR. LUECK:  No further questions.

14        THE COURT:  Thank you, sir.

15        Any Recross?

16                      RECROSS EXAMINATION

17        BY MR. HOWARD:

18   Q    Mr. LaPoint, you didn't bring any of those checks with

19   you today, did you?

20   A    No.

21   Q    But they would be in your office, correct?

22   A    No.  They're generated out of Warsaw, Indiana.

23   Q    And Warsaw is DePuy, correct?

24   A    Correct.

25        MR. HOWARD:  Thank you.

1         THE COURT:  You may step down, Mr. LaPoint.  Thank

2    you.

3                           (Witness excused.)

4         THE COURT:  I understand, with that, completes the

5    evidence?

6         MR. LUECK:  Yes, Your Honor.

7         We do anticipate the filing of a declaration or

8    affidavit from Candice Polich.  You may recall that she was

9    identified as the subrep.

10        Due to her absence over the weekend, I believe that

11   that has just been sent to us and will be filed by the end

12   of the day.

13        That would be the only supplemental evidence beyond

14   what we have in the record presently that we would introduce

15   in support of our TRO.

16        THE COURT:  My ruling may precede it, so we'll have

17   to see.

18        Any evidence for the Defense?

19        MR. HOWARD:  No, Your Honor.

20        I don't know if the Court wants to entertain any

21   further arguments on any of the --

22        THE COURT:  Yeah, but let me invite -- since the

23   Plaintiff is the primary moving party -- and I understand

24   you have your own functions as well.  Let me invite the

25   Plaintiff to go first.

1          MR. LUECK:  Thank you, Your Honor.

2          Your Honor, in many respects, this is a classic

3     noncompete case.  There's evidence that an individual and

4     entity -- although there's argument on which.  I'll address

5     that momentarily.  But the covenant was signed.  A

6     termination took place, and the covenant has been violated.

7          Interestingly enough, there is no evidence

8     contradicting the evidence that there have been violative

9     acts since the departure of Mr. Gault.  There certainly

10    could have been a Gault declaration to that extent.  There

11    has been.

12         The evidence -- and we believe that it is

13    well-supported through the affidavits of Daneman.  The

14    affidavit of LaPoint and the testimony today is that despite

15    the obligation that Gault and Gault South Bay have not to

16    violate their obligations of noncompetition, they have done

17    so.

18         There is an issue that Mr. Howard is pressing very

19    strongly, that somehow Bob Gault is not party to this and is

20    not in any way bound by this.

21         Interestingly enough, if you relate back to the

22    California complaint that Gault, Gault South Bay, and

23    allegedly Ms. Polich signed, they explicitly identify Bob

24    Gault as the president and sole shareholder of Gault South

25    Bay and see a sufficient concern about whether he's covered

1    by that covenant to feel necessary not merely to bring that

2    lawsuit on behalf of Gault South Bay but also on behalf of

3    Bob Gault.  I would submit that Defendants' actions speak

4    more loudly than their words in terms of there being some

5    coverage.

6              THE COURT:  I lost you.

7              As I understand, you're saying that they're

8    concerned that DePuy might claim that the covenant covers

9    Mr. Gault rather than just the corporation, somehow is proof

10   that it does cover Mr. Gault rather?

11             MR. LUECK:  Well, it's certainly evidence that this

12   is not a closed question.  It is an open question that they

13   felt was a sufficiently open question to name both Gault and

14   Gault South Bay as parties to that in that complaint.

15             But more to the point, it is well established, and

16   it's particularly well established that under Indiana law

17   that parties cannot use subterfuge to avoid obligations of

18   noncompetition.

19             That goes back to the McCart versus McCart case,

20   which we've cited in our briefing, and the Norlund v Faust

21   case.  You can't use subterfuge to avoid a noncompete.

22             Here you have a situation where Bob Gault was the

23   sole shareholder, the president of this company, and he's

24   going out and competing.

25             THE COURT:  What is the subterfuge?