**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| DEPUY ORTHOPAEDICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| GAULT SOUTH BAY, INC. and | ) | |
| ROBERT GAULT, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF BRADFORD C. LAPOINT

I, Bradford C. LaPoint, under the penalties for perjury, state:

      1.    I have personal knowledge of the facts set forth in this Affidavit, except as otherwise stated. I am competent to testify as to all matters stated, and I am under no legal disability which would in any way preclude me from testifying. If called upon to do so, I would testify to the facts set forth in this Affidavit.

      2.    I am a Territory General Manager for DePuy Orthopaedics, Inc. ("DePuy") with responsibility for sales in northern California, among other areas.

      3.    DePuy manufactures and distributes orthopedic implants and operating room products, among others. These include devices for use in the reconstruction or replacement of shoulders, knees, hips, fingers, wrists, ankles, and shoulders.

      4.    DePuy contracts with sales representatives throughout the country to sell these products.

      5.    These sales representatives are DePuy's primary point of contact with the physicians and hospitals that use DePuy's products.

      6.    DePuy provides the sales representative with training, product literature, and a defined territory.

7.    Sales representatives play a vital role in DePuy's business.  They have to educate customers about product features, assist customers in understanding the proper use of the products, and often observe surgeries first hand to ensure that the products are being used appropriately.

8.    Sales representatives also acquire, on behalf of DePuy, information about DePuy's customers, including their needs, preferences and sales history.

9.    The relationship a sales representative enjoys with a customer, enhanced by the sales representative's knowledge of the customer's preferences, needs and account history, will often drive the customer's purchasing decision.

10.    In my experience, most sales representative contracts, including those used by DePuy, include restrictions on competition by the sales representative in the event the contract is terminated.

11.    Based on my own experience, DePuy has suffered losses of customers and sales in a matter of days or weeks when departing sales representatives violate these restrictions.

12.    I have reviewed DePuy's contract with Gault South Bay, Inc. ("Gault South Bay") and Robert Gault (as president of Gault South Bay), dated November 22, 2006. A true and accurate copy of the executed agreement as it is maintained in DePuy's records is attached as Exhibit A to this Affidavit (the "Agreement").

13.    Appendix A to the Agreement references Gault South Bay's territory as "All accounts listed for customer number 701940." The number 701940 is Mr. Gault's senior sales representative account number, and identifies all customers assigned to Gault South Bay.  A true and accurate list of the customers included in this account number is attached as Exhibit B to this Affidavit.

14.    This agreement was amended by letter dated December 21, 2006, to adding two provisions concerning commissions.  A true and accurate copy of the amendment as it is maintained in DePuy's records is attached as Exhibit C to this Affidavit.  There have been no other amendments to the Agreement.

2

15.    Based on my personal knowledge and my review of DePuy's records, DePuy provided Mr. Gault and Gault South Bay with sales literature and promotional items as needed.

16.    Based on my personal knowledge and my review of DePuy's records, DePuy has paid all commissions or flat payments due to Gault South Bay through the date of this Affidavit.

17.    Biomet Orthopedics, Inc. ("Biomet") is a competitor of DePuy, as Biomet sells orthopedic implants and operating room products that compete with DePuy products. Working as a sales representative or otherwise working on behalf of Biomet would require engaging in competitive activities as defined by the Agreement.

18.    On or about July 13, 2007, Mr. Gault approached me at a sales meeting in Chicago and told me he was looking at moving to a competitor, including potentially Biomet. Mr. Gault said he did not want to leave, but did not know if he had a choice. I understood this to be an attempt by him to renegotiate his contract, which was not at-will, but provided that Gault South Bay's appointment as a DePuy sales representative "will remain in effect until December 31, 2007."

19.    On or about August 12, 2007, I received a call from Jake Daneman, one of the DePuy sales representatives working under Mr. Gault in the South Bay area. Mr. Danemen informed me that Mr. Gault had solicited him to work for Biomet.

20.    I also learned that Mr. Gault had approached sales representatives Mike Olmes, John Angeleri, Candice Polich, and Craig Fry to solicit them to work for Biomet. Mr. Olmes was at that time the sales representative for the territory adjacent to the territory of Mr. Gault, and Mr. Angeleri, Ms. Polich, and Mr. Fry were sales representatives under Mr. Gault. I spoke with each of these individuals directly and they told me that Mr. Gault had attempted to get them to move to Biomet while Mr. Gault was still a DePuy sales representative.

21.    On or about August 14, 2007, I received a call from a surgeon at Stanford University Medical Center who at the time was an account in Mr. Gault's territory who ordered DePuy products through Mr. Gault. He informed me that Mr. Gault had solicited him to purchase Biomet products rather than the competing DePuy products, and that Mr. Gault had

3

promised him that Biomet would make him his own implant if he agreed to switch to Biomet products.

22.     On or about August 15, 2007, I spoke with a surgeon at Los Gatos Hospital who was another account in Mr. Gault's territory. He informed me that Mr. Gault had told him he was moving to Biomet, and solicited him to purchase Biomet products rather than DePuy products.

23.     On or about August 21, 2007, I spoke with another surgeon at Stanford University Medical Center. He informed me that Mr. Gault had left him a voicemail, asking him to write a letter stating that he was discontent with DePuy's services and products.

24.     On or about August 30, 2007, I spoke again with the first surgeon. He told me Mr. Gault had met with him and two other doctors from Los Gatos and solicited them to purchase Biomet products instead of DePuy products.

25.     At the time of those solicitations, Mr. Gault was still an independent contractor sales representative for DePuy and subject to the obligations in his Agreement. Nevertheless, he never requested my consent and I never gave him consent as his Territory General Manager to make such solicitations.

26.     Based on my personal knowledge and a review of DePuy's records, DePuy has not given Mr. Gault or Gault South Bay permission to work for Biomet or otherwise released them from the covenant not to compete in the Agreement.

27.     I considered Mr. Gault's solicitation activities referred to above to be clear breaches of the Agreement, and provided sufficient cause to terminate the Agreement. Accordingly, on August 20, 2007, I sent Mr. Gault a letter informing him that the Agreement would be terminated, effective August 24, 2007, although Gault South Bay and Mr. Gault post-termination obligations to DePuy continue. A true and accurate printout of this letter is attached as Exhibit B to this Affidavit.

28.     It is my understanding based on numerous discussions with DePuy sales representatives and physician customers that Mr. Gault formally started working with Biomet on September 4, 2007.

4

29.    On or about September 10, 2007, Mr. Gault arranged and held a meeting with DePuy customers in Gault South Bay's territory for the purpose of soliciting those customers to purchase products from Biomet rather than from DePuy.  Mr. Gault had invited Candice Polich to the meeting to continue to solicit her to join Biomet, and I learned about this meeting and its purpose from her.

30.    If Mr. Gault is permitted to continue to solicit his former DePuy customers and sales representatives on behalf of Biomet, DePuy will lose customers, and DePuy's goodwill will be irreparably harmed.

THIS CONCLUDES MY AFFIDAVIT.

I affirm, under the penalties for perjury, that the facts set forth in this Affidavit are true based on my personal knowledge or, where stated, on information and belief.

Bradford C. LaPoint

**SWORN BEFORE ME** in the City    )
of _Emeryville_, in the State of California, )
this _11_ day of September 2007.    )
                                      )
_____    )
A Notary Public    Signature    )
_Marina Harris_    )
                Printed

My Commission Expires: _2/26/2011_



5

# EXHIBIT A

T-117

**RECEIVED**

JAN 02 2007

**COMMISSIONS**

**DePuy**

a Johnson-Johnson company

**DePuy Orthopaedics, Inc.**

November 22, 2006

Gault South Bay Inc.
18428 Twin Creeks Road
Monte Sereno, CA 95939

Dear Bob,

Effective January 1, 2007 (the "Effective Date") please accept this letter as DePuy Orthopaedics, Inc.'s ("DePuy") appointment of Gault South Bay Inc. ("Contractor") as its independent sales representative for the specific DePuy Territory ("Territory") and specific DePuy product categories (the "Products") as outlined on the attached Appendix A, which appendix is incorporated herein by reference. DePuy may add or delete any or all Product category or categories included on Appendix A or change the category or classification of any or all of the Products included in the Product categories listed on Appendix A at any time on sixty (60) days prior written notice to Contractor. Except as set forth herein, the Territory described on Appendix A may be modified from time to time only as mutually agreed by the parties.

Contractor agrees that it is an independent contractor and not an employee of DePuy. Contractor shall be responsible for making sales calls representing DePuy and completing sales within the Territory in accordance with DePuy and Johnson and Johnson ("J&J") guidelines, policies and procedures, including without limitation, policies and procedures concerning prevention of healthcare fraud and abuse, that are made known to Contractor from time to time. Contractor agrees to devote its best efforts and sufficient working time to selling DePuy Products. Contractor agrees to cause its employees, contractors and other entities which assist Contractor with its duties under this Agreement to participate in and comply with the requirements of the Salesforce Certification Program outlined in Appendix C. Contractor further agrees that DePuy may, on at least thirty (30) days prior written notice to Contractor, change the requirements set forth in the Salesforce Certification Program but may not during the term of this Agreement, modify the Recognition and Non-Compliance section of such Program without Contractor also agrees to attend and participate, and cause its employees, contractors and other entities assisting Contractor in its duties under this Agreement, to attend and participate in sales training and training related to DePuy and/or J&J guidelines, policies and procedures as required by DePuy. The manner in which Contractor performs its obligations under the Agreement is at Contractor's sole discretion, provided that Contractor complies with DePuy's sales policies and procedures. Contractor is required to submit orders to DePuy, or, in the case of Co-Marketed Products, (as defined below) to other parties, and may from time to time be requested by DePuy to provide reports to DePuy regarding Contractor's sales activities or results. Contractor agrees that neither Contractor nor anyone in its employ, nor any member of the immediate family of any one owning the majority of the stock, a controlling interest or exercising control of the Contractor will, during the time that this appointment is in effect, sell any competitive products or engage in any competitive activities without obtaining DePuy's prior written consent. Competitive activities mean selling, offering for sale, promoting, receiving or soliciting orders for goods or services similar, or intended for a similar use as those offered by DePuy or any other J&J company, or accepting remuneration of any kind from any person providing such goods and services. Contractor is, of course, free to engage in any non-competitive activities.

4240 Holden Street  ●  Emeryville, California  94608  ●  Toll Free Phone: (866) 592-5633  ●  Ph: (510) 597-4220  ●  Fax: (510) 597-4221

Gault South Bay Inc.
November 22, 2006
Page 2

Contractor acknowledges and agrees that the noncompetition provisions contained in this Agreement are a material inducement to DePuy to enter into this Agreement, are reasonable and necessary to protect DePuy's interests and will result in material and irreparable loss to DePuy if breached.

Contractor may hire its own employees or contract with other individuals or entities to assist Contractor in the performance of its duties hereunder, which employees, individuals or entities shall be solely Contractor's responsibility and shall be compensated solely by Contractor. Contractor agrees that any such employees, individuals or entities will not be subject to DePuy's approval or supervision, but will be bound by the same DePuy and Johnson & Johnson guidelines, policies and procedures, the non-compete provisions and all other provisions of this agreement to which Contractor is subject. Contractor agrees to provide DePuy with information regarding such employees and/or copies of any agreements between Contractor and any such employees, individuals or entities as requested by DePuy. Contractor further agrees to remove any such employee from the sale of Product should DePuy have a reasonable objection to their representation or sale of such Products. Contractor further agrees to modify such agreements as reasonably requested by DePuy to achieve the purposes of this paragraph. Contractor is responsible for maintaining its own office and/or office equipment for its employees' use.

Contractor will be responsible for all federal, state and local income taxes, social security, unemployment compensation, workers compensation and insurance coverage and all expenses incurred by Contractor or its employees in the performance of this Agreement.

Prices for the Products will be set by DePuy at its sole discretion and commissions will be paid based on the actual price charged by DePuy to the customer. Contractor shall not offer or otherwise communicate any discount on any Product without DePuy's prior written consent. DePuy may change the price of any Product at any time. Contractor agrees that it will not enter into any agreement with any customer of DePuy or any third party regarding the sale or delivery of the Products and that Contractor has no authority to bind DePuy to such agreements or any other agreements of any kind.

Contractor will not in any way modify DePuy packaging or products, including any related instruments and accessories. Contractor will only sell DePuy products, which conform to the specifications and quality control procedures of DePuy. Contractor will not provide, suggest or advise the use of any other instrument(s) in connection with the Products outside of those provided or approved for use by DePuy. Contractor will not knowingly submit to DePuy any false, inaccurate or misleading information regarding the sales of products, the customers to whom the products were sold, or the inventory of products in Contractor's possession. Contractor will not engage in direct billing of products to any customer or any other person. Direct billing means any transaction involving a third party's acquisition, use or lease of a

Gault South Bay Inc.
November 22, 2006
Page 3

Product, instrument or service connected with a Product which results in such third party being invoiced or charged a price or fee(s) of any kind, including a delivery charge or fee, for the product or instrument by Contractor, someone in Contractor's control or employ, or by an entity in which Contractor has a financial interest. Pursuant to DePuy's and J&J's policies and procedures, Contractor will immediately report to DePuy any reports of problems with any DePuy product which comes to its attention, including without limitation, adverse events regarding such products.

DePuy will pay Contractor a monthly commission, as described on Appendix B, based on invoice sales completed to customers in the Territory while this appointment is in effect. It is DePuy's normal business practice to pay earned commissions by the 20th day of the month following the generation of the invoice. This will be the only compensation paid by DePuy to Contractor regarding sales of the products. DePuy will pay commissions on Contractor's sales based upon invoices generated by DePuy. The commission rate for a sale already completed will only be adjusted by mutual written consent. *Notwithstanding the foregoing, if Contractor fails to meet the requirements established by DePuy in the Salesforce Certification Program, Contractor agrees that DePuy may adjust the commission rates as describe in Appendix C.* Contractor agrees to repay DePuy on demand any commission paid in error, any commission for which DePuy is unable to collect the underlying invoice, or any advance or any other commission which Contractor did not earn. Commissions on Co-Marketed Products will be paid as set forth below.

Contractor agrees to meet mutually agreed upon annual sales quotas for each Product category. Provided this agreement has not been terminated, Contractor agrees to meet with DePuy representative(s) no later than thirty (30) days prior to the anniversary of this agreement to discuss such sales quotas for the next year. If Contractor fail to meet with DePuy representative(s) or if Contractor and DePuy cannot reach agreement on such sales quotas before the anniversary date of this agreement, then both parties agrees that the annual sales quotas for the next year will be equal to the prior year's sales for each of the following Product or Product Categories, provided these Products or Product Categories are included in Appendix A, in the Territory plus the following percentages: ten percent (10%) for Total Hip Systems and Total Knee Systems; fifteen percent (15%) for Extremities; twenty percent (20%) for Bone Cement and/or Orthobiologics and/or Trauma Products; and three percent (3%) for O.R. Products. In the event that Contractor fails to meet such annual sales quotas for any or all Product categories for two (2) successive calendar quarters on an annualized basis, Contractor agrees that DePuy may, at its sole option, may take the following actions on thirty (30) days prior written notice to Contractor: (a) terminate this agreement: or (b) remove any Product category(ies) from the Products listed on Appendix A; or (c) modify the Territory described in Appendix A. DePuy's

Gault South Bay Inc.
November 22, 2006
Page 4

exercise of any of the foregoing options a, b or c shall not be considered or construed as a waiver of DePuy's right or option to future exercise of any such option for continued failure to meet any sales quota(s).

DePuy will reimburse Contractor certain expenses Contractor incurs in connection with Contractor's performance of its obligations under this Agreement, in accordance with DePuy sales policies and procedures. In no event, however, will Contractor be reimbursed for its travel or transportation expenses. Notwithstanding the foregoing, DePuy may, at its sole option, reimburse Contractor for travel and related expenses incurred by Contractor in connection with sales training, trade, and educational meetings and seminars, Contractor and/or its employees attends at DePuy's request.

DePuy will supply Contractor at no charge with reasonable quantities of descriptive literature, promotional materials and catalogs describing the products and access to inventory and instrument as DePuy feels is appropriate. DePuy at its option may accept or refuse orders and will not be bound by an order until it is accepted by DePuy. Further, DePuy shall not be liable to Contractor for any loss or damages caused by non-acceptance of orders, by failure to deliver products or by delays in making shipments. Contractor agrees that DePuy may at any time this Agreement is in effect and for a period of three (3) years after termination of this Agreement for any reason audit and inspect Contactor's business record to ensure compliance with DePuy and J&J policies and procedures.

From time to time during the term of this appointment, DePuy may, but shall not be required to offer new products for sale in the Territory ("New Products"). With regard to such New Products in the Territory, DePuy reserves the right, in its sole discretion, to (a) on thirty (30) days prior written notice to Contractor, require Contractor to market and solicit sales of New Products pursuant to the terms of this Agreement; or (b) on thirty (30) days prior written notice to Contractor, require Contractor to jointly introduce and market such New Products in conjunction with the efforts of DePuy and any other J&J company or companies ("Affiliate") and/or DePuy's business partners ("Business Partner"). For purposes of this Agreement, an "Affiliate" is any other company or entity controlling, controlled by or under common control with DePuy and a Business Partner shall include, without limitation, an individual or entity which is not an Affiliate and which has contracted with DePuy regarding the marketing or distribution of such New Product; or (c) introduce and market such New Product on DePuy's own behalf or through its Affiliates on an exclusive basis, in which event such New Products will not be made available to Contractor or included in the Products covered by this Agreement. DePuy shall have the sole and exclusive right to establish the terms under which New Products will be marketed and to make all decisions regarding such marketing arrangements, including but not limited to, decisions regarding customer account representation, commission rates, credit for sales, and/or commission splits (if applicable). Notwithstanding anything to the contrary contained in this Agreement, DePuy shall not be liable to make any payment to Contractor with regard to a New

Gault South Bay Inc.
November 22, 2006
Page 5

Product if Company introduces and markets such New Product pursuant to (c) in the immediately preceding paragraph. All of Contractor's obligations regarding Products shall also apply to any New Products which are added to this Agreement.

Notwithstanding anything herein to the contrary, DePuy shall have the right to enter into Co-Marketing Arrangements (as defined below) with its Affiliates related to the marketing, representation and sale of New Products. As used herein, "Co-Marketing Arrangement" means that New Products subject to a Co-Marketing Arrangement will be marketed, represented and sold in the Territory through the sales forces of DePuy and/or its Affiliates and/or its Business Partners. DePuy reserves the sole right to establish the terms under which New Products will be co-marketed and to make all decisions regarding such Co-Marketing Arrangements, including but not limited to, decisions regarding customer account representation, commission rates, credit for sales, and/or commission splits (if applicable). Products currently subject to a Co-Marketing Arrangement are identified on Appendix A, which may be modified from time to time by DePuy. Products and New Products currently subject to a Co-Marketing Arrangement or which become subject to a Co-Marketing Arrangement during the term of this Agreement will be referred to herein as "Co-Marketed Products". Commissions from the sale of Co-Marketed Products will be included in commission payments made to Contractor within forty-five (45) days of the first to occur of (a) receipt by DePuy of the actual commission from the applicable Business Partner or Affiliate or (b) receipt by DePuy of a report from the Business Partner or Affiliate confirming the sale and/or commission due from the sale of the Co-Marketed Product.

Contractor will not engage in any advertising or promotion of any of the Products, New Products or Co-Marketed Products in any form or media without DePuy's prior written consent or approval. Contractor further agrees not to issue any payment or otherwise convey or provide any item of independent value to any health care provider, whether an institution or an individual, for any reason without prior written approval from DePuy.

This appointment will remain in effect until December 31, 2007. The appointment shall be automatically renewed for one (1) year periods thereafter unless terminated by either party on sixty (60) days' notice prior to the end of the initial term or any renewal period. In the event that DePuy provides written notice pursuant to this paragraph that this Agreement will not be renewed or extended at the end of the initial term or any renewal term, Contractor agrees that anytime in the sixty (60) day period immediately prior to termination or expiration of this Agreement, DePuy may, at its sole option, immediately terminate this Agreement by paying Contractor an amount equal to one (1) month's average commissions based on the prior six (6) months commissions paid to Contractor, in which case the noncompetition period described below will commence upon Contractor's receipt of such payment.

In the event that neither party provides sixty (60) days notice prior the end of the term that this Agreement will not be extended for an additional year, DePuy may, on sixty (60) days written notice prior to the end of the term or then current term, change or modify the Territory. However, DePuy agrees, that, except as agreed to by the parties, changes or modifications in the Territory will not occur more than once per year with while this Agreement is in effect.

08/24/07 Case 5:07-cv-05897-JW-CAN    Document 15-3 PT. filed 02/11/2007    page 7 of 15

Gault South Bay Inc.
November 22, 2006
Page 6

The appointment may be terminated unilaterally by either party on thirty (30) days' notice in the event of either (a) breach of any provision of this appointment which, if correctable, is not corrected within the thirty (30) days notice period; or, (b) if either party becomes bankrupt or enters into any arrangement with its creditors or enters into liquidation. DePuy, at its sole discretion, may also terminate this Agreement thirty (30) days written notice to Contractor in the event Contractors and/or Contractors employees, contractors and other entities assisting Contractor in its duties under this Agreement fail to participate in or comply with the requirements of the Salesforce Certification Program. Notwithstanding the above, however, Contractor agrees that there will be sufficient cause to terminate this appointment immediately in the event that Contractor or any of its employees sells a competitive product, knowingly provides to DePuy false and misleading information regarding products sold, engages in direct billing, violates any written DePuy or J&J policy and procedure, is debarred, excluded or otherwise prohibited from participation in any Federal or state healthcare program as defined in 42 U.S.C Sect. 1320a-7b(f) for the provision of items or services for which payment may be made by a federal healthcare program, if Contractor knowingly employs or contracts with an individual or entity so debarred, excluded or prohibited. Contractor agrees to notify DePuy of any final adverse action, discovery of employment by or contract with an excluded individual or entity or exclusion as defined above within thirty (30) days of such an action. Contractor further agrees that DePuy may terminate this Agreement immediately if Contractor commits any act or omission which in DePuy's sole determination has or will have a negative effect on the reputation of DePuy and/or J&J. The appointment will automatically terminate in the event of the dissolution of Contractor or if Contractor, or a major part of its assets, becomes subject to the direction or control of a party other than the owner(s) of Contractor at the time this agreement is signed by the parties..

Upon termination, Contractor further agrees to return to DePuy all DePuy owned inventory, instruments and promotional materials in Contractor's possession. Any inventory, instruments and promotional materials related to Co-Marketed Products shall be returned either to DePuy or another party, as directed solely by DePuy. Contractor also agrees to reimburse DePuy for any such inventory which is not returned and for which there is no record of sale to any other party or which is returned to DePuy in a damaged condition rendering such inventory incapable of sale. Contractor also agrees within thirty (30) days of the termination of this agreement for any reason to pay to DePuy any sums that are outstanding. DePuy agrees to pay Contractor any commissions due to Contractor within thirty (30) days of termination of this Agreement; however, DePuy may offset against such commissions any amounts owed by Contractor to DePuy. Contractor further agrees that DePuy may deduct from any commissions owed to Contractor any outstanding amounts resulting from Contractor's failure to return to DePuy any inventory, instruments and promotional materials in its possession or for which there is no record of sale or any inventory which has been damaged to a point where it is no longer capable of sale. Any office or other equipment purchased by Contractor shall remain its property upon termination.

Gault South Bay Inc.
November 22, 2006
Page 7

Contractor further acknowledges that it may be receiving and processing Protected Health Information ("PHI") as that term is defined in 45 C.F.R.Section 164.501 from the Company or on its behalf, that has been disclosed subject to a HIPAA authorization, under 45 C.F.R. Section 164.508 or to a Business Associate Agreement(s) between DePuy and a healthcare provider or institution, copies of which shall be provided to the Contractor by DePuy upon request by the Contractor.    Contractor will collect, hold, use and disclose such information only for the purposes authorized in the Business Associate Agreement and as expressly directed by DePuy.

Contractor shall not disclose any PHI to any third party or use PHI for any purpose, commercial or otherwise.   Contractor shall either (a) remove any PHI from its records and/or systems no later than thirty (30) days after receipt of such PHI or (b) take reasonable measures to ensure the security and confidentiality of such PHI.   Contractor's failure to comply with this Section shall be considered a material breach of this Agreement and DePuy shall have the right to terminate this Agreement pursuant immediately without payment of any penalty or termination fee.

Contractor agrees that, if this Agreement is terminated for any reason, that for or a period of one (1) year after termination of the Agreement, that neither Contractor nor any of its employees, independent contractors, or agents who were involved in the representation or sale of the Products, will, without DePuy's prior written consent, accept a position with a competitor of DePuy, which involves direct or indirect sales of competitive products in the same Territory or sales to the same accounts covered by the Agreement or engage, directly or indirectly in the sales of competitive products or in competitive activities as described above. Contactor agrees that no claim that Contractor, or any of its employees, independent contractors or agents  may have against DePuy shall constitute a defense to enforcement of the noncompetition provisions of this Agreement. Contractor also agree to waive any defense to entry of a preliminary injunction prohibiting its violation of the noncompetition provisions of this Agreement based on the existence of an adequate remedy at law by DePuy. As consideration for the foregoing agreement not to accept such a position, upon termination of this Agreement, DePuy agrees to pay Contractor on a monthly basis during the one (1) year period after termination an amount equal to one-twelfth of the aggregate commissions paid to Contractor for the twelve months prior to such termination, beginning with the first month following such termination. DePuy will pay Contractor this amount unless this Agreement is terminated by DePuy due to Contractor's sale of a competitive product, or providing DePuy with false and misleading information about the sale of products, or direct billing or failure to comply with DePuy and/or J&J policies and procedures.
Notwithstanding the foregoing, however, if DePuy should give Contractor thirty (30) days prior written notice before it begins such payments that it chooses not to make such payments or if during the one year (1) period after termination DePuy should give Contractor thirty (30) days prior written notice that it will cease making such payments, then Contractor will be released from any and all restrictions on accepting a position with a competitor of DePuy and/or on sales of product competitive to DePuy.  In addition, if Contractor should accept a position with a

Gault South Bay Inc.
November 22, 2006
Page 8

competitor or enter into any agreement or arrangement with any third party which involves, directly or indirectly, the sales of products competitive to DePuy during the one (1) year period after terminate, such payments shall immediately cease and DePuy shall have no further obligation to make such payments. In each such event described above, will Contractor have no right or claim to any further payments from DePuy.

Contactor acknowledges and agrees that the noncompetition provisions of this Agreement, including, without limitation, the scope and geographical areas included therein, are fair and reasonable and reasonably required for the protection of DePuy and to enable DePuy to obtain the benefit of this Agreement.

Contractor represents and warrants to DePuy that the execution, delivery, and performance of this Agreement by Contractor will not conflict with, breach, cause a default under, or result in the termination of any contract, employment relationship, agreement, or understanding, oral or written, with any third party, including without limitation any noncompetition covenant to which or by which Contractor is bound and that there are no other commitments or agreements that would prevent Contractor from entering into this Agreement or performing the obligations required of Contractor under this Agreement. In the event that Contractor is so bound or has commitments or agreements that prevent it from entering into this Agreement or performing its obligations under this Agreement, Contractor agrees that this Agreement will not commence until it is free of any such agreements or commitments, and that it will not perform any of its obligations under this Agreement while such agreements or commitments are in existence. In the event that the foregoing should delay the Effective Date of this Agreement, Contractor agrees that DePuy may, at its sole discretion and without further obligation to Contractor, terminate this Agreement at any time prior to the actual start of this Agreement. Contractor agrees to indemnify, hold harmless and defend DePuy, its employees, officers and directors, against any causes of action, claims, suits, proceedings, damages and judgments arising out of any claim by any third party arising out of any alleged or actual misrepresentation or violation of the provisions of this paragraph.

It is expressly stipulated, agreed and understood between the parties that the business relationship between Contactor and DePuy shall be that of independent contractor and not employer-employee or principal-agent. Contractor further agrees that the only monetary or economic obligation of DePuy to Contractor shall be to provide commissions as set forth herein that Contractor shall not be entitled to receive and shall not receive from DePuy any medical

Gault South Bay Inc.
November 22, 2006
Page 9

coverage, vacation pay, pension benefits, stock options, insurance, or any other type of employee or fringe benefit. Should Contractor otherwise have any right to receive any such benefit from DePuy, Contractor hereby expressly waive the right to receive same. Neither Contractor nor DePuy shall have the authority to legally bind the other in contract, debt or otherwise.

Contractor further represents and warrants that Contractor is not now and has not at any time in the past been debarred, excluded or otherwise prohibited from participation in any Federal or state healthcare program as defined in 42 U.S.C Sect. 1320a-7b(f) for the provision of items or services for which payment may be made by a federal healthcare program and Contractor has not knowingly employed or contracted with an individual or entity so debarred, excluded or prohibited. Finally, Contractor agrees that Contractor has no rights of any kind concerning the Territory and cannot assign its appointment or any part of this agreement to any other party or recover any money from any party to whom DePuy may subsequently assign all or part of the Territory. Any attempt to do so will be cause for DePuy to immediately terminate Contractor's appointment as DePuy's independent sales representative. Both parties agree that Indiana law shall govern and interpret this appointment and the relationship between the parties, that any and all jurisdiction and/or venue for any claims or matters related to or arising from this Agreement shall be reside in the state and/or federal courts located in the state of Indiana. Each party specifically agrees to waive our right to trial by jury in any litigation arising from this Agreement. Each party agrees that this Agreement supersedes any and all other agreements, written or oral, regarding this appointment and relationship with DePuy including, without limitation, the letter dated December 5, 2005. Each party agrees that the language of this Agreement will be construed as a whole, according to its fair meaning and not for or against either of us, regardless of who drafted such language. If a court of competent jurisdiction or an arbitrator finds or determines any provision of this Agreement invalid or unenforceable, such provision shall not affect the remainder of this Agreement, which shall remain in full force and effect.

08/24/2007 13:37 FAX 0074257858 SCAN    DEPUY 15613 DEPT    page 11 of 15

Case 5:07-cv-05897-JW    document 13-4    filed 09/11/2007    page 11 of 15

Gault South Bay Inc.
November 22, 2006
Page 10

If Contractor agrees to accept this appointment under these terms, please sign and return to the undersigned the enclosed copy of this document. Contractor agrees that the above Agreement is not effective until approved by the appropriate DePuy' Director for Sales or other appropriate officer of DePuy. .

If there are any questions please feel free to contact me. We look forward to working with you.

Very truly yours,

Bradford C. LaPoint
Territory General Manager Northern California

**AGREED AND ACCEPTED:**                    **APPROVED:**

Contractor                                   DePuy Orthopaedics, Inc.

By: _Bob Gault_                              By: _Jim C. Cowar_

Title: _President_                           Title: _Pacific Area Director_

Date: _12/21/06_                             Date: _12/22/06_

As a material inducement to DePuy to enter into the foregoing agreement, and with full intent to be bound by the terms of the foregoing agreement, the following individual(s) agree, represent and warrant that they will personally perform all the obligation of the Contractor and will honor and perform all the promises of the Contractor, including without limitation, those addressing Contractor's noncompete obligations during the term of the foregoing agreement and after termination thereof.

_____
name

_____
date

## APPENDIX A

**Territory:**     **All accounts listed for customer number 701940:**

**Contractor:** **Gault South Bay Inc.**

**Products:**          DePuy Product categories to include:

- Total Hip Systems
- Total Knee Systems
- O.R. Products (Excluding Hall Power Equipment)
- Extremities
- Bone Cement and Accessories
- Trauma Products

- Co-Marketed Product categories to include:

  - Orthosorb
  - Restore
  - Conduit
  - Alpha BSM
  - Symphony
  - I.C. Graft Chamber
  - Optium
  - Cellect & Cellect DBM Bone Products, excluding those with Healos

**Symphony/IC Graft Chambers/Conduit/Cellect/Optium ("SICCO") Product Commissions:**

Product Categories:
- Co-Marketed Products
  - Symphony
  - I.C. Graft Chamber
  - Conduit
  - Optium
  - Cellect & Cellect DBM Bone Products, excluding those with Healos

1. For Sales Representatives with Orthopaedic and Trauma product responsibilities SICCO commissions will be calculated as follows:

   - SICCO Base Commission rate will match the sales representative's orthopaedic base commission rate. SICCO base commission will be paid on 100% of the SICCO net sales billed by DePuy and/or its Affiliates and/or its Business Partners.

   - DePuy Orthopaedic and SICCO net sales (at 100%) will be combined and measured against prior year sales. Standard growth commission will be paid on Orthopaedic sales in excess of last year's sales. Sales growth commissions for SICCO will be calculated on 50% of the SICCO sales growth dollars. The growth commission percentage rate for SICCO will be the same additional percentage as the rep's orthopaedic growth commissions.

Gault South Bay Inc. will receive an addition 1% commission (total of 12%) towards payment for John Angilieri for the length of this contract on the following accounts, (Stanford University 339740, Sequoia HS 327550, VAPA 360129, Menlo Park Surgical Hospital 307232, Surgical Center of Palo Alto 339740).

Gault South Bay Inc. will receive a commission subsidy of $3,000 per month towards sales coverage at Stanford University. This will remain in effect until the first to occur, Termination of the Agreement or you cease to have additional individuals working with you to assist you in performing your sales obligations under this Agreement.

Upon achieving annual Sales Goal in core Trauma, Hand Innovation and Biologics of 30% growth over prior six months and year-end a 1% bonus on total sales (DePuy Reconstructive excluded) will be paid. Bonus will be paid at 6 and 12 months if sales meet target.

Gault South Bay Inc. will receive an addition .5% commission on all Reconstructive Sales should territory be at or above 15% growth and 1% should territory be at or above 20% growth over 2006 year end Reconstructive Sales. Bonus will be paid at 6 and 12 months if sales meet target.

Gault South Bay Inc. will receive an additional 1% on all Knee sales should Knee sales meet or exceed sales quota of 15% growth over 2006 year end Knee sales. This will be paid at the end of year.

**Appendix C**

**DePuy Salesforce Certification Program**

**General Program Overview:**
The Certification Program will begin February 1, 2006. An 18-month time frame will be used for the Primary Certification period.

*Participation:*
All DePuy Sales Associates and their sub-representatives and/or assistants are required to participate in and comply with the requirements of this Certification Program.

*Reconstructive Sales Associates:* Hips, Knees, Extremities and ORCA
Sales Associates who have contracted with DePuy **prior to February 1, 2006** will need to accumulate **29** Continuing Education Credit hours over the 18-month period to achieve Primary Certification. Associates who contract with DePuy **after February 1, 2006** will need to accumulate **95** hours.

*Trauma Sales Associates:*
Sales Associates who have contracted with **DePuy prior to February 1, 2006** will need to accumulate **45** Continuing Education Credit hours over the 18-month period to achieve Primary Certification. Associates who contract with DePuy **after February 1, 2006** will need to accumulate **80** hours.

*Orthobiologics Sales Associates:*
Sales Associates who have contracted with DePuy **prior to February 1, 2006** will need to accumulate **35** Continuing Education Credit hours over the 18-month period to achieve Primary Certification. Associates who contract with DePuy **after February 1, 2006** will need to accumulate **55** hours.

Once the Primary Certification is accomplished, all Sales Associates must complete **25** continuing education credit hours per 12-month period to retain their certification status.

**Primary:** Consists of courses that focus on our core product offerings.
**Continuing Education:** Consists of courses that focus on **honing product knowledge, surgical and selling skills,** which build upon the core product certification.

Sales Associates must complete a minimum of **25 continuing education credit hours** per year to retain their certification status. Failure to meet this requirement will result in being demoted to a non-certified status and at DePuy's sole option, implementation of the Non Compliance Consequences set forth below.

Pfiedler Enterprises will act as DePuy's third party accreditation body for this program. Pfiedler's role is to grant credits from **The International Association of Continuing Education and Training (IACET)**.

**Sales Associate Recognition/Non Compliance Consequence:**

*Company Store Representatives:*
Beginning in 2007, DePuy will reduce commissions ½% for each year a Sales Associate does not meet certification requirements. The maximum commission penalty will be 1%. Failure to achieve certification in any given year is considered a material breach of the Sales Associate Agreement.

*Recognition:*
All Sales Associates achieving certification will be recognized at the NSM. Other recognition may include name badge enhancement to identify certification and certification insignia that could be added to business cards indicating certification. Sales Associate certification accomplishments will also be featured prominently on www.accessdepuy.com.

**Course Catalog:**
A course catalog detailing the various learning opportunities and associated CMEs will be distributed prior to the start of each calendar year. The Courses included in this catalog may be added, modified and or deleted by DePuy at anytime. However, the Sales Associate who successfully completed a Course prior to deletion will retain credits for that Course.

**New requirements for OST learning connections 08/2006**
**Credit requirements for primary certification are as follows:**

**Biologics Certification Track**

- Start date before February 1, 2006 – 20 credit hours Primary - 12, Elective - 8

- Start date after February 1, 2006 – 38 credit hours – Primary -30, Elective -8

**Trauma and Extremities Certification Track**

- Start date before February 1, 2006 – 31 credit hours – Primary 23, Elective 8

- Start date after February 1, 2006 – 76 credit hours – Primary 68, Elective 8

**Reconstructive Products Certification Track**

- Start date before February 1, 2006 – 36 credit hours – Primary 29, Elective 7

- Start date after February 1, 2006 – 84 credit hours – Primary 77, Elective 7

# EXHIBIT B

**BOB GAULT - 701 940**

| Hospital | City | Account |
|---|---|---|
| Advanced Surgery Center | San Jose | 104215 |
| Bascom Surgery Center | Campbell | 102644 |
| Camino Medical Group | Santa Clara | 504092 |
| Community Los Gatos | Los Gatos | 161675 |
| El Camino Hospital | Mt. View | 181225 |
| El Camino Surgery Center | Mt. View | 181226 |
| Forest Surgery Center | San Jose | 189208 |
| Good Samaritan | San Jose | 203900 |
| Harold Chope Comm Hospital | San Mateo | 165075 |
| Menlo Park Surgical Hospital | Menlo Park | 307232 |
| O'Connor | San Jose | 286100 |
| Palo Alto Surg Center | Palo Alto | 339740 |
| Reg Med Center San Jose | San Jose | 102000 |
| San Jose Market consol dist. Ctr | San Jose | 324200 |
| Sequoia Hospital | Redwood City | 327550 |
| Silicon Valley Surg Center | San Jose | 103970 |
| Stanford | Palo Alto | 335560 |
| VA Palo Alto | Palo Alto | 360129 |
| Valley Medical Center | San Jose | 324788 |
| Waverly Surgery Center | Palo Alto | 102529 |

# EXHIBIT C

T-117

**RECEIVED**

December 21, 2006

MAR 21 2007


**DePuy**
a Johnson & Johnson company

Gault South Bay Inc.
18428 Twin Creeks Road
Monte Sereno, CA 95939

**COMMISSIONS**
McMillans

**DePuy Orthopaedics, Inc.**

Dear Bob,

Concerning your Sales Agreement (the "Agreement") dated November 22, 2006; we agree that effective January 1, 2007 the agreement will be amended by adding the following to Appendix B:

1.   Gault South Bay Inc. will receive and additional 1% commission (12%) on the following accounts for the commission add for John Angileri, CN335560, 327550, 307232, 339740, 360129, and 102529.

2.   Gault South Bay Inc. will receive an addition .5% commission on all Reconstructive Sales should territory be at or above 10% growth and 1% should territory be at or above 15% growth over 2006-year end Reconstructive Sales. Bonus will be paid at 6 and 12 months if sales meet target.

All other provisions and terms of the Agreement will remain in effect and unmodified.

If the above changes are acceptable to you, please sign and return to me the two copies of this letter. You agree that this amendment is not effective until approved by Depuy's Area Director of Sales or other appropriate officer of DePuy. If there are any questions please feel free to contact me.

Sincerely,

Brad LaPoint
Territory General Manager Northern California

Agreed and Accepted:                                    Approved:

Representative Name:                                    DePuy Orthopaedics, Inc.

Robert G. Gault                                         By:
Print

Date: 3-10-07                                           Title: Pacific AD

                                                        Date: 3-12-07

4240 Holden Street  ●  Emeryville, California   94608  ●  Toll Free Phone: (866) 592-5633  ●  Ph: (510) 597-4220  ●  Fax: (510) 597-4221

09/10/2008 3:07-cv-00425-RLM-CAN    document 3-6 TAL filed 09/11/2007    page 3 of 6
09/10/2007 20:09 FAX  31723   33         BARNES&THORNBURGLLP                    002/005

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DEPUY ORTHOPAEDICS, INC.,           )
                                    )
          Plaintiff,                )
                                    )
     v.                             )   Civil Action No.
                                    )
GAULT SOUTH BAY, INC. and           )
ROBERT GAULT,                       )
                                    )
          Defendants.               )

## AFFIDAVIT OF JAKE DANEMAN

I, Jake Danemen, under the penalties for perjury, state:

1.     I have personal knowledge of the facts set forth in this Affidavit, except as otherwise stated. I am competent to testify as to all matters stated, and I am under no legal disability which would in any way preclude me from testifying. If called upon to do so, I would testify to the facts set forth in this Affidavit.

2.     I am a sales representative ("sales rep") for DePuy Orthopedics, Inc. ("DePuy"). I have been a DePuy sales rep for about three years. My territory includes customers in the South Bay area of San Francisco, California.

3.     I worked under Bob Gault and his company, Gault South Bay Inc., from January of this year until his contract was terminated by DePuy in August 2007. John Angileri, Candice Polich, and Craig Fry worked as DePuy sales reps under Mr. Gault as well.

4.     On or about August 12, 2007, Mr. Gault called me and told me he was going to work for Biomet Orthopedics, Inc. ("Biomet"), a competitor of DePuy. He told me he was working on bringing a team of DePuy sales reps to work at Biomet with him, and that he wanted me to join them. He told me he had already spoken to Mr. Fry and Ms. Polich, and that he had encouraged them to move to Biomet as well.

5.    That same day, after speaking with Mr. Gault, I called Brad LaPoint, our DePuy Territory General Manager, and told him what Mr. Gault had told me. Mr. LaPoint told me to keep him informed, which I did.

6.    The following week, Mr. Gault and I met at the VA Hospital in Palo Alto, California, and he continued to solicit me to work for Biomet. He told me he had a plan to convert his current DePuy customers to Biomet products, and that he intended to bring specific DePuy customers to Biomet. For example, he said he was confident he could get several doctors at Stanford University to use Biomet rather than DePuy products. He also said I should contact a Biomet distributor named Chris Robbins to discuss the details of moving to Biomet with him, and gave me Mr. Robbin's phone number.

7.    Mr. Gault called me several more times over the next month, encouraging me to work for Biomet.

8.    On or about August 15, 2007, Mr. Robbins called me to discuss my working for Biomet. I had not called him, and had not spoken with him before. Mr. Robbins told me that Mr. Gault had told him I would be a good sales rep for Biomet and recommended that he call me.

9.    I met with Mr. Robbins on two occasions. He provided me an offer of employment on both occasions. The second offer was memorialized in a letter sent August 22, 2007.

10.    On August 22, 2007, I spoke with Ms. Polich and asked her whether she planned to follow Mr. Gault to Biomet. She told me Mr. Gault had been putting pressure on her to work for Biomet, and that Mr. Gault was promising to get 70% of the doctors at El Camino Hospital in Los Gatos to switch from DePuy to Biomet products. She told me she had nevertheless decided to stay at DePuy.

11.    During the week of August 20, 2007, Mr. Gault and Mr. Robbins both told me that a Biomet lawyer would call me to "take care of things." I did not request or agree to have such a lawyer contact me.

2

09/10/2007 19:55   Case 3:07-cv-00425-RLM-CAN   document 26-5   filed 09/11/2007   page 4 of 4

09/10/2007 20:10 FAX  31723...33          BARNES&THORNBURGLLP                      ☑004/005

12.    On August 24, 2007, a lawyer from the law firm of Downy Brand named Tory Griffin called me. I had no prior relationship with Mr. Griffin, I have not been a client of his law firm, and I have never expressed any interest in becoming a client. Mr. Griffin asked me to sign a representation agreement so he could "get you out of your non-compete" with DePuy so I could leave and work for Biomet. I did not agree to have him represent me, and I did not sign any agreement. Mr. Griffin is not now and has never been my lawyer.

13.    On August 27, 2007, I communicated my decision to not work for Biomet to Mr.Griffin and Mr. Robbins, and rejected Biomet's offer of employment.

14.    Based on my personal knowledge and conversations with DePuy customers, Mr. Gault appears to be assisting in sales of Biomet products to his former DePuy customers.

15.    For example, in mid August, 2007, prior to Mr. Gault's termination, two of Mr. Gault's doctor customers told me that Mr. Gault had recently encouraged them to purchase Biomet products instead of DePuy products, and promised them benefits if they did so. One doctor told me that Mr. Gault promised to get him a consultant contract with Biomet if he switched to Biomet products. Another doctor told me that Mr. Gault promised to get him a position as a developer with Biomet if he switched to Biomet products.

16.    On another occasion, a doctor told me that Mr. Gault had been harassing doctors to switch to Biomet products, claiming to one that if they did not switch, he could not put his kids through college.


THIS CONCLUDES MY AFFIDAVIT.

I affirm, under the penalties for perjury, that the facts set forth in this Affidavit are true based on my personal knowledge or, where stated, on information and belief.

Jake Daneman

**SWORN BEFORE ME** in the City                              )
of San Francisco , in the State of California, )
this *10th* day of September 2007.                     )
                                                                         )
                                                                         )
_A Notary Public_          **Signature**              )
          Maryo Mogannan               )
                                       **Printed**

My Commission Expires:  July 08 2011

MARYO MOGANNAM
Commission # 1758053
Notary Public - California
San Francisco County
My Comm. Expires Jul 8, 2011

4pages

4