Mark A. Neubauer (No. 73728)
Rebecca Edelson (No. 150464)
Carla A. Veltman (No. 223910)
Steptoe & Johnson LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, CA 90067
Telephone: (310) 734-3200
Facsimile: (310) 734-3300
Email: mneubauer@steptoe.com
Email: redelson@steptoe.com
Email : cveltman@steptoe.com

Attorneys for Plaintiff
DEPUY ORTHOPAEDICS, INC.,
an Indiana corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DEPUY ORTHOPAEDICS, INC., an Indiana corporation,

Plaintiff,

GAULT SOUTH BAY, INC. a California Corporation, and BOB GAULT, an individual,

Defendants.

CASE NO. 5:07-cv-05897-JW

DECLARATIONS OF BRADFORD C. LAPOINT, AUDREY FRUSH, DWIGHT LUECK AND MARK A. NEUBAUER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT AND FRCP 56(f) APPLICATION

The Honorable James Ware, Ctrm 8

Date: April 28, 2008
Time: 9:00 a.m.
Place: Courtroom 8
280 South 1st Street
San Jose, CA 95113

**DECLARATION OF
BRADFORD C. LAPOINT**

**DECLARATION OF BRADFORD C. LAPOINT**

I, Bradford C. LaPoint, hereby declare:

1. Since January 2003, I am and have been the Territory General Manager for DePuy Orthopaedics, Inc. ("DePuy"). My responsibilities include overseeing sales and distribution for DePuy, interacting with DePuy's customers, including physicians and hospitals, and supervising all sales representatives working within my territory within Northern California. At all relevant times, I have supervised approximately thirty or more sales representatives. At all relevant times, these sales representatives were organized into approximately five different teams, including Gault South Bay, Inc. ("Gault South Bay") and Robert Gault ("Gault"), until August 24, 2007 when DePuy terminated its sales representative agreement with Gault South Bay.

2. I have personal knowledge of all of the facts set forth herein, and, if called and sworn as a witness, I would and could competently testify thereto.

3. DePuy designs, manufactures and sells orthopedic implants and operating room products. DePuy's products include joint replacement products for the shoulders, knees, hips, fingers, wrists, ankles and shoulders, as well as operating room products throughout the United States and elsewhere.

4. DePuy is headquartered in Warsaw, Indiana. Based on my years working for DePuy, I am familiar with those DePuy functions that are managed through DePuy's Indiana headquarters. DePuy's headquarters provide and have provided throughout my tenure DePuy's administrative services for all sales, including those made in California. The majority of DePuy's manufacturing and design for its products originates and have originated throughout my tenure out of DePuy's Indiana headquarters. No manufacturing or design for DePuy products is located in California. Products delivered to customers in my territory have been either shipped from DePuy's Indiana facilities directly to a customer or to my sales office, after which they were then distributed to customers. I have warehoused some products at my California location, but that inventory of products was shipped from DePuy's Indiana facilities. In addition, DePuy has consignment agreements with hospital customers whereby they house

instrumentation and inventory shipped to them primarily from DePuy's Indiana headquarters. My California office is merely a regional sales office.

5. One of my responsibilities for DePuy as Territory General Manager has been to manage and support sales representatives in Northern California for DePuy. As part of that responsibility, I have frequently visited DePuy customers and am and have been familiar with DePuy's billing and shipment procedures to customers. My office, under my supervision, has routinely reconciled pricing for products for customers and submitted the final paperwork to a hospital customer for a purchase order, but then that paperwork once finalized by the customer was sent to Indiana. Customers then made payments for products directly to DePuy's Indiana headquarters. My supervisory responsibilities also has included reviewing and managing commission reports, which show DePuy's calculation of the commissions owed to sales representatives in my territory. Throughout my tenure as Territory General Manager, all commission reports have been generated out of DePuy's Indiana headquarters and all commission payments to DePuy sales representatives have been likewise generated from Indiana.

6. Since January 2003 until August 2007, I worked extensively with Robert Gault, who has been a DePuy sales representative since February 1998 either individually or through his corporation Gault South Bay. I have personally reviewed and signed the sales representative agreements and amendments thereto that Robert Gault has entered into with DePuy on an annual basis from November 2003 through November 2006, including those signed on behalf of Gault South Bay. Attached hereto as Exhibit 1 is a true and correct copy of the most recent sales representative agreement entered into between Gault South Bay and DePuy, which I signed on behalf of DePuy and which Robert Gault signed on behalf of Gault South Bay. That Agreement was executed on November 22, 2006, with an effective date of January 1, 2007 through December 31, 2007. I refer to that agreement throughout this Declaration as the "Agreement."

7. The Agreement with Gault South Bay was amended by letter dated December 21, 2006, to include two additional provisions concerning commissions. A true and correct

copy of that amendment, maintained in DePuy's records in the ordinary course of DePuy's business, is attached hereto as Exhibit 2. There were no other amendments to the Agreement.

8. The sales representative agreements with Gault and Gault South Bay that I signed on behalf of DePuy were not my own creations. Instead, the form and substance of these agreements originated from DePuy's Indiana headquarters. The form and substance of the agreements I use for sales representatives in my territory, including those with Gault and Gault South Bay that I signed on behalf of DePuy, originated out of the Indiana office, and those agreements are subject to final approval by DePuy's Indiana headquarters, and are sent to DePuy's Indiana headquarters after they are signed. The fact that the Agreement is subject to final approval outside of California is reflected in the Agreement on the last page where it states that "Contractor agrees that the above Agreement is not effective until approved by the appropriate DePuy Director for Sales or other appropriate officer of DePuy."

9. DePuy's sales representatives, including Robert Gault and Gault South Bay while they worked for DePuy, play a vital role in DePuy's business. DePuy has provided sales representatives with training and product literature so that sales representatives can educate customers about product features and how to use the products properly. Almost all of these training materials have originated by DePuy's Indiana office, and much of it has been sent directly to the sales representatives from DePuy's Indiana headquarters. Sales representatives also have been required to complete online training, some of which I have also been responsible for completing. Online training also has originated out of Indiana.

10. Sales of orthopedic products is a highly competitive industry and, in my experience, a customer's purchasing decisions between competing products are often driven by the relationship between the sales representative and the customer. Sales representatives, including Robert Gault, are paid by DePuy to develop detailed information about DePuy's customers, including their needs, preferences and sales history. For example, sales representatives for DePuy even attend surgeries to ensure that physicians are properly using DePuy products. This type of personal interaction and a sales representative's knowledge of a customer's preferences, needs and account history will often drive the customer's purchasing

decision. The goodwill developed between a sales representative and DePuy's customers in a territory is developed at significant expense to DePuy, including expenses associated with training a sales representative, providing educational materials to a sales representative in order to further the training and education of the customers in the use and utility of DePuy's products, and the compensation paid to a sales representative.

11. In my experience, DePuy's agreements with its sales representatives include restrictions on competition by the sales representative in the event the contract is terminated. The Agreement between Gault South Bay and DePuy, like all of Gault South Bay and Gault's prior agreements with DePuy, includes a non-compete provision. The Agreement identifies the territory and accounts subject to this non-compete in Appendix A to the Agreement, where it references Gault South Bay's territory as "All accounts listed for customer number 701940." I recognize the number 701940 as Gault's senior sales representative account number. A true and correct copy of the list of customers included under account number 701940 as of August 2007 is attached hereto as Exhibit 3.

12. In my experience, companies that sell orthopedic products routinely use non-competes in their agreements with their sales representatives. These agreements serve to protect the goodwill with DePuy's customers. Sales and goodwill, in my observation, are reliant on the relationship between a sales representative and the customers in his territory. Given the intense competition between these businesses, if a sales representative begins to solicit DePuy's customers on behalf of a competitor, then DePuy will lose sales and risks losing all business from an account entirely. I have observed this phenomenon on multiple occasions. Since the relationship between the customer and the sales representative is developed and maintained on DePuy's dime, DePuy requires its sales representatives to sign non-competes agreements. These agreements prevent the sales representative from leaving and handing over that business to a competitor. Based on my own experience, DePuy has suffered losses of customers and sales when departing sales representatives violate the restrictions in their agreements and directly compete with DePuy in their former territory.

13. That scenario is exactly what has happened with Robert Gault and Gault South

Bay. Gault individually or through Gault South Bay sold DePuy products to physicians and hospital customers of DePuy for close to a decade in a territory in Northern California that included hospitals in San Jose, Santa Clara, Campbell, Palo Alto, Mountain View, Redwood City, Menlo Park, and Los Gatos. DePuy paid Gault and Gault South Bay to maintain these relationships with its customers. I know this because I interacted with those customers and was involved in the management of hosted meetings for the customers he serviced, and monitored his commission reports. Gault and Gault South Bay were paid approximately $1 million on an annual basis to oversee and service these relationships on behalf of DePuy.

14. On or about July 13, 2007, Robert Gault approached me at a sales meeting in Chicago and told me he was looking at moving to a competitor. Gault said he did not want to leave, but did not know if he had a choice. I understood Gault's comment to be an attempt to renegotiate his contract, which remained in effect until December 31, 2007.

15. However, in August 2007, I began receiving calls from sales representatives and customers stating that Gault had commenced solicitation of business for DePuy's competitor, Biomet, Inc. ("Biomet"), while still under exclusive contract with DePuy. Biomet is a direct competitor to DePuy, and, like DePuy, designs, manufactures and sells joint replacement products. Biomet is also headquartered in Warsaw, Indiana. I know this because I used to work for Biomet. On or about August 12, 2007, I received a call from Jake Daneman, a DePuy sales representatives working under Gault in the South Bay. Daneman told me that Gault had solicited him to work for Biomet. I also learned from Daneman and other DePuy sales representatives that Gault had approached three other sales representatives working under him, including John Angeleri, Candice Polich and Craig Fry, and two other DePuy sales representatives working in adjacent territories to Gault's territory, Mike Olmes and Eulis Haselden, to solicit them also to leave DePuy and work for Biomet.

16. On or about August 14, 2007, I received a call from Dr. Steven Woolson, a physician with Stanford University Medical Center, who was an account in Gault's territory who ordered DePuy products through Gault. Dr. Woolson said to me that Gault had solicited him to purchase Biomet products rather than competing DePuy products. Dr. Woolson told me

that Gault had promised him that Biomet would make Dr. Woolson his own implant if Dr. Woolson agreed to switch to Biomet products. On or about August 15, 2007, I spoke with Dr. Ed Littlejohn, a physician at Los Gatos Hospital, another account that ordered DePuy products through Gault. Dr. Littlejohn told me that Gault told him he was intending to move to Biomet and had solicited him to purchase Biomet products rather than DePuy products. On August 21, 2007, I spoke with Dr. John Lannin at Stanford University Medical Center who told me that Gault had left him a voicemail, asking him to write a letter stating that he was discontent with DePuy's services and products.

17. Based on my personal knowledge and review of DePuy's records, DePuy did not give Gault or Gault South Bay permission to work for Biomet and did not otherwise release them from the conditions of the Agreement, including the covenant not to compete in the Agreement, at the time Gault engaged in these solicitations and work for Biomet. In fact, Gault was still under exclusive contract with DePuy through December 31, 2007. Upon learning of Gault's obvious violation of the Agreement, I sent to Gault a letter informing him that the Agreement would be terminated, effective August 24, 2007, although Gault South Bay and Gault's post-termination obligations to DePuy continued. A true and correct copy of that letter, dated August 23, 2007, is attached hereto as Exhibit 4.

18. Gault has continued to solicit his former DePuy customers on behalf of Biomet. I learned that Gault arranged and held a meeting on September 10, 2007 with DePuy customers in Gault and Gault South Bay's territory for the purpose of soliciting those customers to purchase product from Biomet.

19. DePuy has lost at least $100,000 to $150,000 in sales each month since September. At least one physician whom Gault serviced on behalf of DePuy is no longer purchasing any DePuy products since Gault left. Other physicians whom Gault also serviced while working for Biomet, are ordering reduced amounts of product from DePuy since Gault left for Biomet.

20. Gault had other options for employment other than accepting a job in which he was directly competing with DePuy. Gault's skills as a salesperson are translatable to other

products that do not compete with the products he sold for DePuy. Gault also could have easily found work outside of the territory he serviced on behalf of DePuy. For example, he could have sold the same type of products he sold on behalf of DePuy to hospitals in San Francisco, outside of his territory for DePuy, or to other hospitals in Northern California outside of the limited list of hospitals that were his customers on behalf of DePuy, without violating his agreement. Examples of such potential customers outside of Gault South Bay's territory (as defined by the Agreement) include hospitals such as UCSF, Alta Bates Summit Medical Center and St. Francis Memorial Hospital, to name just a few.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of March, 2008, at Emeryville, California

Bradford C. LaPoint

**DECLARATION OF AUDREY FRUSH**

**DECLARATION OF AUDREY FRUSH**

I, Audrey Frush, hereby declare:

1. I have worked for DePuy Orthopaedics, Inc. ("DePuy") since approximately April 1999. Since approximately June 2004, I have been a Finance Manager for DePuy, supporting various departments within DePuy including Selling & Marketing, Research & Development, and Medical Affairs, including by providing budgets and projecting expenses and projected revenue for these departments. From approximately May 2001 to June 2004, I was a Field Sales Support Manager. My responsibilities as a Field Sales Support Manager included calculating commissions for sales representatives and sales offices, managing and approving commission payments and wire transfers, and developing budgets for DePuy's sales offices around the country. I also supported DePuy's sales management departments. In June 2004, after I became a Finance Manager for DePuy, Michelle Rems took my place as Field Sales Support Manager.

2. I have personal knowledge of all of the facts set forth herein, and, if called and sworn as a witness, I would and could competently testify thereto.

3. Through my various roles at DePuy, I am familiar with DePuy's organizational structure, commissions payment functions to sales representatives and the administrative functions originating from DePuy's Warsaw, Indiana headquarters. Over my decade with the company, I have observed that DePuy has over 1000 employees and contractors working out of its Warsaw, Indiana headquarters, where I, too, am located. DePuy's orthopaedic products are primarily developed and shipped from DePuy's facilities in Indiana. DePuy's administrative, executive and corporate offices are likewise centered in Indiana.

4. In my role as Field Sales Support Manager, I worked with DePuy sales offices around the country. One of my primary duties was to ensure that sales representatives were paid commissions in accordance with the commission structures set forth in their individual agreements with DePuy. My office therefore received copies of all sales representative agreements for sales representatives around the country, including those located in California, who sold various DePuy products, so that I could review all payments to the sales

representatives to ensure that they were consistent with the commission structure applicable to each sales representative under his or her agreement. Billing for products sold to customers was and is managed primarily through DePuy's Indiana headquarters. My office would receive periodic sales reports concerning the products sold to customers in various territories, from which I and those employees working for me would then compute and pay out the commissions owed to sales representatives around the country. The sales reports from which commissions were calculated were generated out of DePuy's Indiana headquarters.

5. During my role as Field Sales Support Manager, I frequently reviewed sales representative agreements. Based on my review of sales representative agreements, final sales representative agreements for sales representatives around the country were fairly uniform in terms of their commission structures and what I observed about their other terms. Commission structures might vary across a range depending on the types of DePuy products a sales representative was charged with selling to customer accounts, but the commission structures for sales representatives selling the same type of product did not vary tremendously.

6. When I was a Field Sales Support Manager, my office was also responsible for developing what we call "dashboards." These are reports on a territory-wide basis concerning the amount of sales for a territory, sales growth lost or gained during a period of time, and other trends relating to sales, including commission reports. My office would then deliver this information to the sales management/offices around the country.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of March, 2008, at Warsaw, Indiana.

Audrey Frush

**DECLARATION OF DWIGHT LUECK**

**DECLARATION OF DWIGHT LUECK**

I, Dwight Lueck, hereby declare:

1. At all relevant times, I am and have been an attorney licensed to practice before the Courts of the State of Indiana as well as the the United States District Court for the Northern District of Indiana. I am a partner with the law firm of Barnes & Thornburg ("BTLaw"), attorneys of record for Plaintiff DePuy Orthopaedics, Inc. ("DePuy") in this action (currently numbered C:07-cv-05897-JW) before it was transferred from the United States District Court for the Northern District of Indiana (then numbered 3:07-CV-0425RM). I have personal knowledge of the matters stated herein, and if called as a witness, I would and could competently testify thereto.

2. I make this Declaration in support of DePuy's Opposition to Defendant Robert Gault and Gault South Bay's Motion for Partial Summary Judgment and FRCP 56(f) Application.

3. Shortly before this action was transferred from Indiana, Defendants made a document production on or about October 31, 2007. I received that document production from Defendants' counsel of record in the action before it was transferred from Indiana. A true and correct copy of the October 30, 2007 cover letter accompanying the production that I received from Defendants' counsel of record, Freeborn & Peters LLP, is attached hereto as Exhibit 5. I have reviewed the production and among the documents produced by Defendants are the following:

- Contract For Services made on January 1, 2004 between South Bay, Inc. and Candice Polich number-stamped GSB0024-29. It provides at p. GSB0029 that "Contractor [i.e., Candice Polich] agrees not to engage in the sales of 'competitive products.'" Bracket added. A true and correct copy of this document, GSB0024-29, is attached hereto as Exhibit 6.
- Contract For Services made on August 15, 2004 between South Bay, Inc. and Craig Frey number-stamped GSB0030-35. It provides at p. GSB0035 that "Contractor [i.e., Craig Frey] agrees not to engage in the sales of 'competitive

products.'" Bracket added.. A true and correct copy of this document, GSB0030-35, is attached hereto as Exhibit 7.

- An August 24, 2007 (Friday) email from Steve Woolson to Bob Gault, numberstamped GAULT0008 reflecting that Mr. Gault asked Dr. Woolson to switch prostheses or companies on Wednesday August 22, 2007. A true and correct copy of this document, GAULT0008, is attached hereto as Exhibit 8.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 24th day of March, 2008, at Indianapolis, Indiana.

Dwight Lueck

**DECLARATION OF**
**MARK A. NEUBAUER**

**DECLARATION OF MARK NEUBAUER**

I, Mark A. Neubauer, hereby declare:

1. I am an attorney at law licensed to practice before the Courts of the State of California and before this Court. I am a partner with the law firm of Steptoe & Johnson LLP ("Steptoe"), attorneys of record for Plaintiff DePuy Orthopaedics, Inc. ("DePuy"). I have personal knowledge of the matters stated herein, and if called as a witness, I would and could competently testify thereto.

2. I make this Declaration in support of DePuy's Opposition to Defendant Robert Gault and Gault South Bay's Motion for Partial Summary Judgment and FRCP 56(f) Application.

3. Defendants Robert Gault and Gault South Bay ("Defendants") argue in their Motion for Partial Summary Judgment that they are entitled to ruling that the restrictive covenant included in the agreement Defendants entered into with DePuy (the "Agreement") is unenforceable under California law. DePuy contends that California law does not apply to the Agreement, but that, even if California law did apply to the Agreement, it would be fully enforceable. DePuy, however, has not had an adequate opportunity to develop evidence on the issue of the validity of the Agreement under California law—assuming this Court determines that California law, and not Indiana law, applies.

4. DePuy has not had the opportunity to conduct any discovery because the Court has not yet scheduled a scheduling conference under Federal Rule of Civil Procedure 26. Thus, neither DePuy nor Defendants have exchanged any initial disclosures or propounded any discovery in this forum. DePuy has likewise not been able to serve any notices of deposition in accordance with the Federal Rules.

5. On or about December 7, 2007, I attended a hearing before this Court concerning the proposed consolidation of the instant action with a separate action filed by Robert Gault, which was then subject to a pending Motion to Dismiss brought by DePuy. The Court ordered the parties to file a motion for summary judgment to be heard April 7, 2007. The Court, however, did not make an order concerning discovery or otherwise schedule an FRCP 26 hearing, such that initial disclosure deadlines or other discovery could commence.

6. Once DePuy is able to move forward with discovery, it anticipates serving on Defendants requests for production of documents, requests for admission, special interrogatories and notices of deposition, which will be directed, in part, to the following topics:

- Gault's solicitation of DePuy's customers both before and after the termination of his agreement with DePuy;
- The nature of products Gault is selling to his former DePuy accounts on behalf of Biomet;
- The amount of products, in terms of units of each product, sales figures, and commissions paid to Gault, that Gault is selling to his former DePuy accounts on behalf of Biomet;
- Whether Gault and Gault South Bay are selling products on behalf of Biomet to customer accounts outside of the territory he most recently serviced on behalf of DePuy, where those accounts are located, and how much of his total commissions these account sales represent;
- Whether Gault interviewed with companies other than Biomet and for which territories;
- Why Gault uses similar restrictive covenants in contracts with his own independent contractors;
- Why the narrowness of the restrictive covenants are appropriate; and
- Whether Gault has a similar restrictive covenant with Biomet.

7. I cannot estimate when this discovery will be completed since I do not know when the parties will be permitted to commence discovery. The depositions would be of Defendants and, depending on the discovery provided by Defendants, possibly of certain customer representatives, as well as the deposition of the persons most knowledgeable at Biomet, Inc. These factual matters, concerning which Defendants and third parties, and not DePuy, have personal knowledge, can only be learned through discovery.

8. These factual issues are directly relevant to the issues of Defendants' breaches of the duty of loyalty to DePuy, the nature of Defendants' unfairly competitive conduct, and the fact that Gault and Gault South Bay had numerous alternatives to direct competition with DePuy in violation of their Agreement. Gault's ability to seek other employment other than selling products in violation of the terms of his agreement with DePuy is directly relevant to the fact that Defendants' agreement is a narrow restraint that is enforceable under Ninth Circuit and California law. Gault's solicitation in violation of his agreement and duties of loyalty to DePuy will demonstrate that the covenant is necessary to protect DePuy from Defendants' unfair competition.

9. To decide this motion now, before the parties have had any opportunity to conduct discovery in this forum, is premature. The enforceability of Defendants' agreement under California law cannot be adjudicated on the face of the agreement without further factual development into Defendants' unfair competition and breach of the duties of loyalty to DePuy. Those are fact intensive inquiries that Defendants did not address in their moving papers and which they should not be allowed to address for the first time in their Reply briefing with self-serving declarations that DePuy has not had an opportunity to test through discovery that would lead to controverted evidence as to material facts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of March, 2008, at Los Angeles, California.

Mark A. Neubauer